# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

|  |  |
|---|---|
| **DENISSE VILLAFRANCA,** | ) |
| **Plaintiff,** | ) |
|  | ) |
|  | ) |
| **v.** | ) **CIVIL ACTION** |
|  | ) **1: 18-cv-178** |
| **JONATHAN M. ROLBIN,** *et al.,* | ) |
| **Defendants.** | ) |
|  | ) |

## EXHIBIT A TO
## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' PARTIAL MOTION TO DISMISS

Deposition Jonathan M. Rolbin, *Castro v. Freeman*, 1:09-cv-00208 (S.D. Tex.) Dkt. 227-3

JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                               1–4

---

**Page 1**

1        UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF TEXAS

3           BROWNSVILLE DIVISION

4   ------------------------------- X

5   LAURA NANCY CASTRO, YULIANA     )
    TRINIDAD CASTRO, TRINIDAD       )
6   MURAIRA DE CASTRO, RODRIGO      ) Civil Action
    SAMPAYO, JESSICA GARCIA, ANA    )  B-09-208
7   ALANIS, LUIS MONTEMAYOR, ANA    )
    LUISA GUERRERO, ERVEY LORENZO   )
8   SANTOS, ALICIA RUIZ, MARIA      )
    REYES, JENIFER ITZEL GONZALEZ,  )
9   Plaintiffs, In Their own        )
    Names and On Behalf of All      )
10  Others Similarly Situated,      )
    vs.                             )
11  MICHAEL T. FREEMAN, Port        )
    Director, U.S. Customs and      )
12  Border Protection; and HILARY   )
    CLINTON, U.S. Secretary of      )
13  State; JANET NAPOLITANO,        )
    Secretary, Department of        )
14  Homeland Security,              ) Pages 1-180
    Defendants.                     )
15  ------------------------------- X

16        DEPOSITION OF JONATHAN M. ROLBIN
              Wednesday, February 20, 2013
17                   9:01 a.m.
              U.S. Department of State
18     Bureau of Consular Affairs, Passport Services
       2100 Pennsylvania Avenue, N.W., Third Floor
19              Washington, D.C.
              Sara A. Watt, RPR, RMR, CRR

20

21

22

---

**Page 2**

1  ON BEHALF OF THE PLAINTIFFS:
     Javier N. Maldonado, Esquire
2    Law Office of Javier N. Maldonado
     8918 Tesoro Drive
3    Suite 575
     San Antonio, Texas  78217
4    (210) 277-1603
     jmaldonado.law@gmail.com
5
   ON BEHALF OF THE DEFENDANTS:
6    Sarah B. Fabian, Esquire
     U.S. Department of Justice, Civil Division
7    450 5th Street, N.W.
     Washington, D.C.  20001
8    (202) 532-4824
     sarah.b.fabian@usdoj.gov
9
   ALSO PRESENT:
10   Anita Mody, Esq.
     Katherine Penberthy, Esq.
11   Leslie Lagomasino
              - - -
12

13

14

15

16

17

18

19

20

21

22

---

**Page 3**

1              I N D E X

2

3  EXAMINATION OF JONATHAN M. ROLBIN:        PAGE

4    MR. MALDONADO                      4

5              - - -

6

7           E X H I B I T S

8

9  ROLBIN DEPOSITION EXHIBITS             PAGE

10  1    Notice of deposition            4

11  (Exhibit retained by the reporter.)

12              - - -

13

14

15

16

17

18

19

20

21

22

---

**Page 4**

1          P R O C E E D I N G S

2            (Plaintiff's Exhibit 1

3            marked for identification.)

4              JONATHAN M. ROLBIN

5  Called for examination by counsel for the

6  Plaintiff, after having been sworn by the notary,

7  was examined and testified as follows:

8        THE WITNESS:  I do.

9        EXAMINATION BY COUNSEL FOR PLAINTIFF

10  BY MR. MALDONADO:

11    Q.   Good morning.  Could you state your name?

12    A.   Sure.  It's Jonathan, J-O-N-A-T-H-A-N,

13  Rolbin, R-O-L-B, like in boy, I-N.

14        MS. FABIAN:  And, Mr. Maldonado, we had

15  discussed previously -- this is Ms. Fabian.  I'm

16  going to make a brief statement for the record.

17        I just want to state that to the extent

18  the questions asked today at the deposition call

19  for my client to provide deliberative process,

20  information covered by the deliberative process

21  privilege in response, I've instructed my client

22  not to divulge any information that's covered by

---



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                            5–8

Page 5

1  that privilege.
2          MR. MALDONADO:  Sounds good.
3  BY MR. MALDONADO:
4      Q.  How do you wish to be addressed today,
5  Mr. Rolbin?
6      A.  Jonathan is fine.
7      Q.  Okay.  My name's Javier Maldonado.  And I
8  represent the plaintiffs in the case of Castro and
9  others versus Freeman and others.
10         Do you understand that?
11     A.  Uh-huh, yes.
12     Q.  I'm going to show you what's been marked
13  already as Plaintiff's Exhibit 1.  It's a notice of
14  deposition that was previously provided to
15  Ms. Fabian, who I understand is the attorney for
16  the agency today.
17         Is that your understanding?
18     A.  Yes, it is.
19     Q.  I'm going to ask you to take a few
20  minutes and go over every subject.  I think there
21  were 17 topics that were identified in the notice
22  of deposition.

Page 6

1          I apologize.  I'm going very fast.
2          As you will see on the last subject, I
3  changed it by hand to number 17, because there were
4  two number 16s.  I think it's page 5.
5      A.  We all make typos.
6      Q.  And so if you could take a chance to look
7  through every topic and if there's a topic there
8  that you are not qualified to testify about, can
9  you tell me?
10     A.  Yes, I think I can testify as to all the
11  topics here.
12     Q.  Okay.  And will you tell me if during the
13  course of the questions you are not qualified or
14  don't have the information to give testimony, will
15  you tell me that you're not able to do that?
16     A.  Yes, I will.
17     Q.  What is your current job title and
18  position?
19     A.  Well, as of October 4th of last year, I
20  was asked to be acting managing director for
21  Passport Support.  That is because my boss is on
22  temporary detail.  I am also the director of Legal

Page 7

1  Affairs and Law Enforcement Liaison at Passport.
2      Q.  And as of October 4th of last year, what
3  is your title, acting direct --
4      A.  Acting managing director for Passport
5  Support.
6      Q.  And are you currently holding that title?
7      A.  Well, it's an act -- not to make things
8  complicated, but it's an acting title.  In other
9  words, it's temporary while my boss is on detail.
10  And then he comes back and would be back in the
11  managing director role.
12     Q.  I understand.  I just --
13     A.  So, yes, I am current -- sorry.  Yes, I
14  am currently occupying that title.
15     Q.  And previous to that, your position, how
16  long have you been in that position, director of
17  Legal Affairs?
18     A.  Since January of 2010.
19     Q.  And before that what was your job
20  position and title?
21     A.  Before that I was a trial attorney at the
22  Department of Justice.

Page 8

1      Q.  And how long were you a trial attorney
2  for the Department of Justice?
3      A.  From September, 20 -- 2008, to January
4  of 2010.
5      Q.  And in your position as director of Legal
6  Affairs, are you the agency's counsel?
7      A.  When you say "the agency," what agency
8  are you referring to?
9      Q.  Let me ask you, isn't the director of
10  Legal Affairs a position within the Department of
11  State?
12     A.  Yes, it is.
13     Q.  Are you the lawyer for the Department of
14  State in that position?
15     A.  I'm not sure I can answer that question.
16  There is a legal department for the Department of
17  State, and then the Bureau of Consular Affairs.
18  Passport has its own legal office.  I am the chief
19  legal officer for Passport, if that clarifies
20  things for you.
21     Q.  Just to understand, in your position as
22  director of Legal Affairs and Law Enforcement



JONATHAN M. ROLBIN                                         February 20, 2013
CASTRO vs. FREEMAN                                                    9–12

Page 9
1  Liaison, do you represent the agency in court
2  proceedings?
3      A.   No.
4      Q.   In your position as director of Legal
5  Affairs and Law Enforcement issues do you file
6  briefs in court, in courts representing the agency?
7      A.   No.
8      Q.   In your position as director of Legal
9  Affairs and Law Enforcement issues do you represent
10  the agency in any administrative proceedings?
11      A.   I'm going to have to ask you to clarify
12  in that question who you're referring to as the
13  agency and administrative proceedings and what
14  you're referring to there.
15      Q.   The agency, I believe it's the -- when
16  you said you're director of Legal Affairs, it's for
17  the Passport agency.
18      A.   So you're asking -- okay.  Do I represent
19  Passport Services in the administrative hearings?
20      Q.   Yes.
21      A.   And what type of administrative hearings
22  are we talking about?

Page 10
1      Q.   Any sort.  Either of an employment
2  dispute nature?
3      A.   Well, to answer as to employment dispute
4  nature, the answer is no.
5      Q.   Any -- do you represent the agency in any
6  hearings provided under the Department of State
7  regs for revoking passports based on fraud?
8      A.   The office represents the agency, the
9  Passport Services directorate, at those hearings.
10      Q.   I understand.
11      A.   The office does.  I do not.
12      Q.   Your office?
13      A.   Correct.
14      Q.   You have other lawyers under you who
15  would do the representation, provide the
16  representation?
17      A.   Correct.
18      Q.   Okay.  Who was your predecessor as
19  director of Legal Affairs and Law Enforcement
20  Liaison?
21      A.   Susan Bozinko, B-O-Z-I-N-K-O, I believe.
22      Q.   Were the job duties changed when you took

Page 11
1  the position of director of Legal Affairs and Law
2  Enforcement Liaison?
3      A.   Not that I'm aware of.
4      Q.   It was the same job posting and job
5  description?
6      A.   I didn't see -- I'm unaware of the job
7  posting.
8      Q.   But there's a job description that
9  describes the duties and responsibilities of the
10  director of Legal Affairs and Law Enforcement
11  Liaison?
12      A.   There is.
13      Q.   Can you describe for me where the
14  Passport Services falls within the organizational
15  structure of the Department of State?
16      A.   Sure.  So within the Department of State
17  there are several different bureaus, which are run
18  by assistant secretaries.  Passport Services falls
19  within the Bureau of Consular Affairs.  The
20  assistant secretary, Janice Jacobs, oversees the
21  Bureau of Consular Affairs.
22          Beneath the assistant secretary there

Page 12
1  are -- in Consular Affairs, there is the Passport
2  Services directorate, as well as Visa Services,
3  Overseas Citizenship Services, fraud prevention
4  programs, consular systems and technology, and
5  probably a few others I can't remember off the top
6  of my head.
7          If you'd like, I think there's an org
8  chart that's publicly available.
9      Q.   And if I understand correctly, you're
10  currently the acting director of the Passport
11  Services directorate?
12      A.   No, I'm currently the acting managing
13  director for Passport Support.
14      Q.   Okay.  And where does the Passport
15  Support unit fall within the Passport Services
16  directorate, if it does?
17      A.   So Passport Services is overseen by one
18  deputy assistant secretary.  Beneath her are two
19  managing directors, managing director for Passport
20  Support and a managing director for Issuance
21  Operations.
22      Q.   I'm sorry, I missed the last part.



Case 1:18-cv-00178   Document 19-1   Filed on 02/26/19 in TXSD   Page 5 of 45
Case 1:09-cv-00208   Document 227-3   Filed in TXSD on 03/15/13   Page 5 of 46

JONATHAN M. ROLBIN                                        February 20, 2013
CASTRO vs. FREEMAN                                                  13—16

Page 13

1    A.   Issuance Operations or issuance.
2    Q.   And so can you explain to me the
3 difference between the Passport Support unit and
4 you the issuance processing?
5    A.   Issuance.
6    Q.   Issuance.
7    A.   Sure.  The easiest way to sum that up is
8 that Issuance oversees the 28 agencies and centers
9 throughout the United States.  Passport Support
10 oversees the support offices that give support to
11 those agencies and centers.
12    Q.   And what type of support assistance is
13 provided?
14    A.   Technical operations; internal controls;
15 legal; adjudication; acceptance facility oversight;
16 PPS and PMO, which I can't remember what they stand
17 for right now, but I'm happy to fill that in when
18 you send me the transcript.  I think it's program
19 management operations, but I'd have to clarify
20 that.  And PPS is another office, which is the
21 financial office.
22          There are seven, if I didn't mention all

Page 14

1 seven.
2    Q.   Okay.  So does the Issuance unit, not the
3 Passport Support unit, but the Issuance unit, they
4 include the 28 agencies, does that mean that all
5 they do is produce the passport?
6    A.   No.  That's a rather simplistic view of
7 the issuance of a passport.  It is a complex
8 process.  And I'm not sure I'm quite the qualified
9 person to go into the details.  I don't think that
10 was within the depo notice, that you needed
11 somebody qualified on everything that the two
12 organizations do.
13          But I think the easiest thing is to --
14 for purposes of this maybe and to help you
15 understand, is that the 28 agencies and centers are
16 where passports are adjudicated.  They are each --
17 each agency and center has a director.  Each
18 director reports to a regional director.  Those
19 regional directors report to the managing director
20 for Issuance.
21          On the support side, the support offices,
22 the seven offices have seven directors.  Those

Page 15

1 seven directors report to the managing director for
2 Support.  And the managing director for Support and
3 the managing director for Issuance report to the
4 deputy assistant secretary.
5    Q.   And what are those seven offices called?
6    A.   I think I mentioned them already.
7    Q.   Oh, those were the PPS, PMO, technical,
8 adjudications, legal?
9    A.   Correct.
10    Q.   Okay.  I'm just trying to understand, so
11 under Passport Support Services, does that unit --
12 do any of the units within that subagency, do they
13 review passport applications?
14    A.   For what purpose?
15    Q.   For the purpose of, for example,
16 approving an application.
17    A.   They do not approve applications.  They
18 respond to questions or issues.
19    Q.   Where, within either the Passport Support
20 Services unit or the Issuance unit, are
21 determinations of revocations of passports made?
22    A.   That's made within the legal department.

Page 16

1    Q.   And where is that legal department, in
2 which unit?
3    A.   In Support.
4    Q.   And where is that legal unit physically
5 located?
6    A.   Here in this office.
7    Q.   I'm just want to get an idea of whether
8 there are offices somewhere outside of D.C. that
9 also conduct the same sort of adjudications with
10 respect to revocations.
11    A.   Right.  And to -- I think we have to
12 clarify something, because I think it's a little
13 unclear.
14          When it comes to passport restrictive
15 actions, okay, which can include law enforcement
16 denials, things like that, that is done in
17 headquarters offices.
18    Q.   And what do you mean by "law enforcement
19 denials"?
20    A.   If you have a felony warrant for your
21 arrest, for example, you are not entitled to a
22 passport.  That case, for lack of a better word, or



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                               17—20

Page 17

1 that application comes to the legal office for
2 review.
3     Q.   Which would be the Passport Support
4 services?
5     A.   Correct.
6     Q.   And then if I understand correctly, the
7 legal office would provide some sort of
8 recommendation that would go back to the Issuance
9 unit to make the final decision?
10    A.   No.  The legal office makes the decision
11 on those.
12    Q.   So if I understand correctly, when there
13 are circumstances where individual cases of, for
14 example, passport revocations will come to --
15 strike that.
16         There will be individual instances where
17 requests for advice regarding revocation of a
18 passport will come to the legal office and the
19 legal office will make that decision?
20    A.   I have a little difficulty with your
21 question, because of the way it's phrased.  I
22 wouldn't phrase it in terms of advice.  The

Page 18

1 decision on whether to revoke a passport or not
2 lies with the Passport legal office.
3     Q.   So the -- just to be sure, the other
4 subagency, Issuance, you said it was called?
5     A.   Correct.
6     Q.   They don't make the final decision with
7 respect to revocations.
8         Is that your testimony?
9     A.   That's correct.
10    Q.   And that has been the case, and by that I
11 mean that the legal department makes a final --
12 makes the final decision with respect to
13 revocations, that has been the case since when?
14    A.   Well, again, I guess I have to clarify
15 something, which is the use of the term "final
16 decision."  Because under our -- okay.
17        The Passport legal office makes the
18 decision on a revocation and issues the revocation
19 decision.  Under our regulations, persons who have
20 a hearing, the final decision is made by the deputy
21 assistant secretary, and that's in 22 CFR 5170
22 et seq.

Page 19

1     Q.   But if I understand correctly, if there's
2 no appeal made it is a final decision?
3     A.   Correct.
4     Q.   Okay.  So unless appealed, a decision by
5 the legal department to revoke a passport is final,
6 correct?
7     A.   I don't know that I'd use the word
8 "appeal," but if somebody requests a hearing on the
9 denial, the final decision is made by the deputy
10 assistant secretary.
11    Q.   Okay.  So for now, when I use the term
12 "final decision," I'm not referring to cases where
13 the passport holder has requested a hearing to
14 review the legal department's decision.
15        Can we agree on that?
16    A.   Well, I'm not sure I would agree on that.
17 I would say that the decision to revoke a passport
18 is made by the legal department.
19    Q.   Okay.  And that has been the case since
20 when?
21    A.   I couldn't tell you how far back that
22 goes.  But that has certainly been the policy of

Page 20

1 the Department of State since I took this office
2 and before.
3     Q.   And to confirm that that was the policy
4 prior to you taking the position of director of
5 Legal Affairs and Law Enforcement Liaison, who's
6 the best person to confirm that the procedure we
7 just discussed with respect to making decisions on
8 revocations was the same one in place prior to your
9 taking the job?
10    A.   Well, I know that it was the same one
11 prior to me taking the job because it's in our
12 manual.  And so in order to determine when that
13 first came about, we'd have to look at historical
14 records.  But that has been in place for quite a
15 while.
16    Q.   And you say it's in the manual.  Could
17 you identify the manual where it would describe the
18 policy that the legal department makes the decision
19 to revoke passports?
20    A.   That's in the Foreign Affairs Manual,
21 often referred to as the FAM, F-A-M.
22    Q.   Do you remember the title?



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                              21–24

Page 21

1    A.   The specific section?

2    Q.   Section, yeah.

3    A.   No.

4    Q.   Can you tell me the ways that a case for

5    revocation will be forwarded to the legal

6    department for a decision?

7    A.   Sure.  A case for revocation -- and we're

8    talking about any revocation, I assume --

9    Q.   That's correct.

10   A.   -- by your question?

11   Q.   That's correct.

12   A.   Because there are a number of different

13   types of revocations.

14        Any case for revocation will come to the

15   State Department, would come to the Passport legal.

16   It can come by mail, it can come by fax, it can

17   come by e-mail.  That's physically how it gets

18   there.

19        It can come from DHS components, law

20   enforcement, passport agencies and centers,

21   overseas posts, the Department of Justice.  I guess

22   that would be included within law enforcement.

Page 22

1        Trying to think who else that it could

2    come from.  It can come from other offices within

3    the Department of State, such as diplomatic

4    security; FPP, which stands for fraud prevention

5    programs.

6        There may be others that I can't think of

7    right now, but that's a pretty fair list.

8    Q.   Is it correct to say that it is not

9    for -- that the legal department is not out there

10   reviewing approved passport applications for

11   revocations, that the request for revocation comes

12   from somewhere in the outside?

13   A.   Well, I take issue with the term

14   "outside," because I don't know -- if you mean

15   outside the State Department, that's not a correct

16   statement.

17   Q.   Outside the legal department unit.

18   A.   Okay.  Yes, the -- your question's a

19   little long, so why don't I just say this.  The

20   legal department does not go out and audit or

21   conduct any reviews for revoking passports

22   themselves.  The information comes in.

Page 23

1    Q.   The legal department, the individuals

2    who -- let me strike that.

3        From some of the documents I have seen,

4    your name appears as the signatory to revoking a

5    passport.

6        Is that fair to say?

7    A.   Yes, the director of Passport Legal signs

8    every revocation letter.

9    Q.   And I suspect that you have subordinates

10   who are the individuals who are reviewing the case,

11   whether to recommend to you revocation or not.

12        Is that fair to say?

13   A.   Correct.

14   Q.   These individuals that do some of your

15   work, help you out with your work, how large is

16   that unit?  How many individuals are working on

17   that?

18   A.   So Passport Legal is divided into two

19   offices, the Office of Legal Affairs and the Office

20   of Law Enforcement Liaison.

21        Revocations come in to Legal Affairs.

22   There is a division chief, one division chief in

Page 24

1    Legal Affairs.  There are five to seven lawyers.

2    Depends, you know, we've had some people leave, we

3    have some new people starting.  About five to seven

4    lawyers.  There are about 10 to 14 paralegals.  And

5    there are some contract staff support within the

6    office.  Not all of those people work on

7    revocations.

8    Q.   And by that, "not all those people," do

9    you mean not all of the contract people or --

10   A.   Contract people do not.  Not all of the

11   paralegals -- well, the contract people do not.

12   Q.   And some but not all of the para and the

13   attorneys work on revocations, is that what you

14   were suggesting?

15   A.   No.  I headed that way, but I realized

16   that's not a true statement.  All the attorneys and

17   paralegals work on revocations.  There are other

18   staff within Legal that do not work on revocations

19   as well.

20   Q.   So before the director of Legal Affairs

21   signs a letter revoking a passport, is it correct

22   to say that the case has been reviewed by a lawyer,



JONATHAN M. ROLBIN
CASTRO vs. FREEMAN

February 20, 2013
25—28

Page 25
1  separate from the director of Legal Affairs?
2      A.  Yes, that is a correct statement.
3      Q.  Besides the regulations in FAM, is there
4  any other written memoranda describing the
5  procedures for revoking a passport?
6      A.  What do you mean by "procedures"?
7      Q.  Guidance as to how certain foreign
8  documents will be evaluated or considered in the
9  decision whether to revoke or not, for example.
10      A.  No, there is no such written
11  documentation on that.
12      Q.  Guidance on the validity or weight to be
13  given to birth certificates that reflect a
14  non-traditional birth, like birth at home as
15  opposed to a hospital.
16      A.  No, there's none of that.
17      Q.  Any guidance about what weight shall be
18  given when a birth certificate from a particular
19  state was delayed, was issued years after the
20  person's birth.
21      A.  Are you talking about written
22  memorandums?

Page 26
1      Q.  Yes.
2      A.  Okay.  No, there are no written
3  memorandums on that.
4      Q.  And just to be clear, your testimony was
5  that there's no written memoranda about guidance to
6  be given where there's a delayed birth certificate
7  and what weight to be given to it, right?
8      A.  Right.
9      Q.  Any guidance about how birth certificates
10  reflecting a non-traditional birth, like birth at
11  home or through a midwife, where the birth happens,
12  for example, in south Texas as opposed to Montana?
13      A.  No.
14      Q.  Any memoranda that describe what is the
15  burden of proof that the government will apply when
16  making the decision to revoke a passport?
17      A.  Other -- again, all of these were
18  prefaced with other than the FAM and the
19  regulations?
20      Q.  That's correct.
21      A.  No.
22      Q.  And if you can recall, I won't hold you

Page 27
1  to it, what does the FAM say what the burden of
2  proof is to revoke a passport?
3      A.  The burden of proof to revoke a passport
4  is preponderance of the evidence.  I am not a
5  hundred percent certain that that is contained
6  specifically in the FAM or not.
7      Q.  Is -- do you know whether it is contained
8  in the regulations?
9      A.  I don't believe it is in the regulations.
10      Q.  And who has the burden of proof when
11  revoking a passport?
12      A.  The department.
13      Q.  And what is your under -- can you
14  articulate for me what the standard is for the
15  burden of proof to revoke a passport?
16      A.  What does "preponderance" mean?  Less
17  than total, more than 50 percent.
18      Q.  And is it your understanding that that is
19  what the FAM says?
20      A.  It's my understanding as a lawyer, from
21  the 20-plus years of experience I have, that that
22  is what preponderance of the evidence means.

Page 28
1      Q.  I understand that.  But I don't know
2  whether that's what the legal department is doing
3  here.
4          So what does the FAM say about what the
5  preponderance of the evidence?
6      A.  I don't know when the FAM specifically
7  says as to what is the preponderance standard.
8      Q.  And it's your testimony that there is no
9  written memoranda other than the regulations and
10  the FAM that would describe the burden of proof to
11  revoke a passport?
12      A.  Correct.
13      Q.  If a passport application was previously
14  approved based on a birth certificate issued by
15  a -- by a state in the United States, that was
16  where the birth certificate was issued years after
17  the person's birth but it was issued -- it reflects
18  birth in a hospital, would that be grounds for
19  considering revocation of that passport?
20          THE WITNESS:  Can you read that back to
21  me?
22          (The reporter read back as requested.)



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                                29–32

Page 29

1      MS. FABIAN:  I'm going to object to form
2  on that.
3      THE WITNESS:  What do you mean by
4  application is approved?  Do you mean a passport
5  was issued?
6  BY MR. MALDONADO:
7    Q.  Passport application.
8    A.  A passport was issued?
9    Q.  A passport was issued.
10   A.  I can't answer that hypothetical alone.
11  What I can tell you is that a passport, once
12  issued, when revoking a passport the department and
13  the office -- essentially, the Passport legal
14  office looks at all of the evidence, the evidence
15  that was before the Passport agency at the time
16  they issued the application and any new evidence
17  that came in with the revocation request.  And they
18  look at the totality of those circumstances and
19  they make a decision based on the totality of those
20  circumstances.
21      There are situations where that decision
22  can be to revoke.  There are decisions where

Page 30

1  that -- there are cases where that decision is not
2  to revoke.  There are instances where that request
3  may come in and it goes back to the requester and
4  says you haven't given us enough evidence.  For
5  example, you can give us more evidence or we're
6  going to close the case.
7    Q.  But if the only evidence in that passport
8  application is a delayed birth certificate, is that
9  grounds for revocation?
10   A.  I don't think I can answer that without
11  an application and the actual circumstances of the
12  particular case.
13   Q.  That's the circumstance, the -- you know,
14  I sent my son's application, included a birth
15  certificate that was issued seven years after his
16  birth, it was approved.  For whatever reason, that
17  case has been forwarded to the legal department for
18  review of revocation.  The only evidence in the
19  file is a delayed birth certificate.
20      Is that grounds for revocation?
21   A.  So there's no driver's license presented,
22  because that would be a problem.  If it's your --

Page 31

1  you mentioned your son.  If he's a minor, was there
2  two-parent consent on that application?  Because
3  that could be a problem as well.
4      So that's the difficulty I have.  You've
5  presented me a situation now where there could be
6  any number of instances where the passport may need
7  to be revoked.
8    Q.  Right.  And the only reason it was
9  forwarded to the legal department is because of the
10  presence of a delayed birth certificate.
11   A.  I know, but I can't answer -- you haven't
12  told me that whether or not there was sufficient
13  two-parent consent.  You haven't told me whether or
14  not there was sufficient identity provided.
15   Q.  But that's not -- that's not the concern
16  from one of the passport centers.  Their only
17  concern is a delayed birth certificate.
18   A.  Okay.  Well, as I told you, what happens
19  when cases come in, all right, they're reviewed.
20  If they don't have sufficient evidence, they go
21  back to the requester.  So if there was no -- so
22  that could be an option.

Page 32

1      I can't answer the question because you
2  haven't given me all of the facts.
3    Q.  Well, I mean, the only fact for which the
4  passport is being considered for revocation is the
5  existence of a delayed birth certificate.  It
6  doesn't -- you know, forget now for the issues
7  whether there were two parents or an ID.  Those
8  issues don't exist.  The only thing is the
9  existence of a delayed birth certificate.
10      MS. FABIAN:  I'm going to object.  I
11  think he answered the question.
12      MR. MALDONADO:  He has not.
13      MS. FABIAN:  He said he can't answer
14  that.
15      THE WITNESS:  The problem is that, and
16  maybe this is the problem, is that whatever the
17  reason the passport is sent in for revocation, the
18  legal office can look at whatever reason within the
19  whole scope of the document.  And there are two
20  things that you have to establish, identity and
21  citizenship.
22      In addition, you know, there's all the



JONATHAN M. ROLBIN
CASTRO vs. FREEMAN

February 20, 2013
33—36

Page 33

1  other restrictive reasons.  The person has a
2  warrant, et cetera, et cetera.  So it's a little
3  difficult for me to answer the hypothetical without
4  an actual case.
5  BY MR. MALDONADO:
6      Q.   If you're concerned about the identity,
7  it's an adult, he has a driver's license, he
8  submits his driver's license with a delayed birth
9  certificate.
10     A.   So now we have a different question?
11     Q.   Yeah.  If the issue, the concern is with
12 identity that you're identified or whether two
13 parents signed it, there's no issue with identity.
14 The person has presented a driver's license.  So
15 the only reason the passport center forwarded the
16 case to the legal department is because of the
17 existence of a delayed birth certificate.
18     A.   But --
19         MS. FABIAN:  I'm going to object to form.
20         THE WITNESS:  The other difficulty I have
21 is that the passport center issued it based on the
22 delayed birth certificate.

Page 34

1  BY MR. MALDONADO:
2      Q.   Right, right.
3      A.   So there is no new or additional
4  evidence.  Is that your hypothetical?
5      Q.   That's right, that's right.
6      A.   Okay.  Well, I think I gave a declaration
7  in this case, right.  And what I will say is this.
8          That passports -- in your example of a
9  revocation request that comes in with no new
10 evidence and there is no additional evidence and
11 there is no indication that anybody made an error
12 of any kind, okay, and the only issue is that the
13 person presented valid identity documents, a
14 delayed birth certificate from a state in the
15 United States, and they are that person, and there
16 is no other additional evidence and there is no --
17 and the issue, the citizenship issue is birth in
18 the United States and not physical presence and not
19 CCA and not any other example or any other thing
20 that I can't think of right now, in that particular
21 situation that you've just given me where there is
22 absolutely zero evidence and zero legal reasons as

Page 35

1  to why that person should be -- should have been
2  denied a passport or should now be revoked, that
3  passport would not be revoked.
4      Q.   Let me give you another factual scenario.
5  A passport, adult passport holder whose passport
6  was approved, reissued a couple of times in the
7  '80s and the '90s; and based, at the time of the
8  person applied, on a driver's license for identity,
9  to demonstrate identity, and a delayed birth
10 certificate reflecting a non-traditional birth,
11 that means not in the hospital.  And the person,
12 for whatever reason, is applying for a benefit for
13 a family member.  And CIS sees the delayed birth
14 certificate and non-traditional birth and forwards
15 it for concerns to the legal department for review
16 of revocation.
17         Is that a possibility that happens?  Is
18 that a -- is that something that has happened in
19 the past few years?
20         MS. FABIAN:  I'm going to object for
21 form.
22         THE WITNESS:  I'm not quite sure I

Page 36

1  followed all of that.
2  BY MR. MALDONADO:
3      Q.   Have you gotten referrals from CIS by
4  U.S. citizens who have a passport whose citizenship
5  has been questioned by CIS because of a delayed
6  certificate indicating non-traditional birth?
7      A.   I can't recall if that particular
8  circumstance, without any other evidence, has ever
9  come in from USCIS.
10     Q.   What about from a consular post?
11     A.   Again, I can't recall.
12         What I can tell you is this.  Whatever
13 the reason that they send it in, whether it's a
14 consular post or U.S. CIS or CBP or DOJ, whatever
15 that reason is that they want to revoke, first and
16 foremost we have a procedure, okay, and they have
17 to follow the procedure.  That comes in.
18         The case is reviewed, regardless of what
19 their reason is.  All of the evidence is looked at,
20 the evidence at issuance, the evidence that they
21 provided, and a determination is made.
22         That determination can be -- and I'm not



JONATHAN M. ROLBIN                                   February 20, 2013
CASTRO vs. FREEMAN                                              37—40

Page 37

1 using your particular example here, I'm giving you
2 a general statement.  That determination by the
3 reviewer could be to recommend revocation, it could
4 be to deny the revocation, and it could be to go
5 back to the requester for more evidence.  Okay.
6 That's what happens with the case.
7       And in the first two instances, the
8 reviewer will provide an assessment based on the
9 preponderance of the evidence standard.  Again,
10 they look at the totality of the circumstances and
11 all of the evidence, both what was provided at
12 issuance and what has subsequently been provided,
13 and make that determination.
14      Q.  Okay.  You previously were generous with
15 your testimony in describing what -- answering a
16 hypothetical where the legal department has
17 received a case where revocation is sought because
18 of a delayed birth certificate issued by one of the
19 states in the United States.
20      Do you recall that?
21      A.  Do I recall my testimony from 20 minutes
22 ago?

Page 38

1      Q.  Yes.
2      A.  Yes, I do.
3      Q.  I just want to change that factual
4 scenario a little bit.  It's still a delayed birth
5 certificate, but it reflects a non-traditional
6 birth.  That's the only evidence in the file.
7      A.  Right.  And what I will tell you is that,
8 like I just said, when that case comes in, that
9 case will be reviewed based on the evidence that's
10 presented.  And one of those three things will
11 happen.  Okay.
12      I think I made a pretty fair point as to
13 why I can't answer the hypotheticals.  Okay.  It's
14 impossible for me to sit here and answer
15 hypotheticals.  If you want to give me a particular
16 case that you have, you know, that's one thing.
17 But to ask me to answer a hypothetical like that,
18 there are so many nuances.
19      Q.  Yeah.  But I'm not -- I'm not interested
20 in testimony about, you know, whether something
21 else in an application, in a passport case, would
22 trigger revocation, the fact that the signatures

Page 39

1 may look odd, you know.
2      A.  But the problem with your hypothetical is
3 that we look at the totality of the circumstances.
4      Q.  I understand.
5      A.  It can include little nuances here and
6 there, too, as well, depending on what the
7 situation is and what the request is and what the
8 evidence is.
9      Q.  And my only curiosity is whether the
10 burden of proof to revoke is met when the file
11 includes a delayed birth certificate reflecting a
12 non-traditional birth?
13      MS. FABIAN:  Object to form.
14      THE WITNESS:  There's no checklist that
15 says if a passport was issued based on this it's to
16 be revoked.
17 BY MR. MALDONADO:
18      Q.  Well, you're not telling me that a -- if
19 your office receives a case of a passport holder
20 who was born in Johns Hopkins, that it would --
21 that that case would -- strike that.
22      I think the legal department appreciates

Page 40

1 that there is a distinction between a
2 contemporaneously-issued birth certificate of a
3 birth reflect -- of a birth in a hospital, versus a
4 delayed birth certificate of a non-traditional
5 birth.
6      MS. FABIAN:  I'm going to object to form.
7 That's not a question.
8      THE WITNESS:  What's the question?
9 BY MR. MALDONADO:
10      Q.  The question, that the legal department
11 appreciates there's a difference between those two
12 sorts of documents?
13      A.  Between a contemporaneous birth record
14 and a birth record delayed for how long?
15      Q.  Seven years.
16      A.  Is there a difference between those two
17 documents?  It's in the regulations.  That's
18 actually in the regulations.
19      Q.  Right.
20      A.  There is a difference, consistent with
21 the State Department regulations.  If that's your
22 question.

JONATHAN M. ROLBIN
CASTRO vs. FREEMAN

February 20, 2013
41–44

Page 41

1    Q.   And let's assume, now, is there a
2  difference for purposes of the review conducted by
3  the legal department of a contemporaneously-issued
4  birth certificate from one of the states reflecting
5  birth in a hospital versus a birth certificate
6  issued by one of the states reflecting a
7  non-traditional birth?
8         MS. FABIAN:  Object to form.
9         THE WITNESS:  Is there a difference for
10  what purpose?
11  BY MR. MALDONADO:
12    Q.   Whether to -- whether it triggers,
13  whether the scintilla of evidence has been met, the
14  preponderance of the evidence has been met to
15  revoke.
16         MS. FABIAN:  Object to form.
17         THE WITNESS:  I can't answer that.  What
18  if the parents are diplomats?  In either one of
19  those instances, if the parents are diplomats, that
20  passport will be revoked.  That's another problem
21  with your hypotheticals.
22  BY MR. MALDONADO:

Page 42

1    Q.   Let's assume they're not diplomats.
2    A.   Okay.
3    Q.   You have a contemporaneously-issued birth
4  certificate from Kansas at a hospital and you have
5  a birth certificate delayed by several months but
6  not longer than a year reflecting a non-traditional
7  birth.
8         Do they have the same evidentiary weight?
9    A.   For purposes of issuing a passport?
10    Q.   For purposes of revoking a passport.
11    A.   What's the new evidence in your scenario?
12    Q.   No evidence other than that --
13    A.   No new evidence?
14    Q.   No new evidence.
15    A.   And no error of any type?
16    Q.   No error of any type.
17    A.   I'm not sure I understand why that case
18  would be sent for revocation.
19    Q.   Is it correct for me to understand that
20  in all cases where there's no new evidence but
21  there is the presence of a birth certificate
22  reflecting a non-traditional birth issued within 12

Page 43

1  months of the person's birth, that those sorts of
2  cases the department will reject or deny
3  revocation?
4    A.   I can't answer that hypothetical.
5         MS. FABIAN:  Object to form.
6         THE WITNESS:  I can't answer that
7  question.  It's too vague.
8  BY MR. MALDONADO:
9    Q.   Well, if I understand correctly, your
10  testimony earlier is that if there's no new
11  evidence in a person's, passport holder's file,
12  that the legal department will not act on a request
13  to revoke?
14    A.   That's not my testimony.  That was not
15  what I said.
16    Q.   So is it your testimony that the
17  department needs new evidence in a passport
18  application to make a determination whether to
19  revoke?
20    A.   That was not my testimony.  I can't
21  answer that question the way you phrased it.
22    Q.   Putting aside cases of diplomats and law

Page 44

1  enforcement issues, will the department revoke a
2  person's passport where the only evidence in the
3  file is a birth certificate reflecting a
4  non-traditional birth issued within 12 months of
5  the person's birth?
6         MS. FABIAN:  Object to form.  Asked and
7  answered.
8         THE WITNESS:  Yeah, again, I'm having
9  difficulty with your questions.  I've said that in
10  order to revoke a passport, and if we're excluding
11  law enforcement, I don't know what grounds you're
12  asking me.
13         There are a number of grounds that we
14  revoke a passport.  So perhaps you could clarify
15  exactly what ground you're asking me on and it
16  might make it a little easier for me to answer the
17  question.
18  BY MR. MALDONADO:
19    Q.   Sure.  On the grounds that the person --
20  and this was previously agreed to with Ms. Fabian.
21  We're not dealing here with cases of fraud.
22    A.   Okay.

JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                             45–48

Page 45

1    Q.   We're only dealing here with section
2  51.62(b), that the person is not believed to be a
3  national or not believed to be a citizen.
4    A.   Okay.
5    Q.   Okay.  So the case has been referred to
6  your legal department because based on this -- the
7  only evidence, no new evidence, but the only
8  evidence that raises a suspicion that the person is
9  not a citizen or a national is the existence of a
10 birth certificate from one of the states reflecting
11 a non-traditional birth.
12       MS. FABIAN:  Object to form.
13       THE WITNESS:  But in your question a
14 passport was issued, correct?
15 BY MR. MALDONADO:
16    Q.   Yes.
17    A.   And a passport was issued based on that
18 birth certificate?
19    Q.   Yes.
20    A.   And there is no error with that birth
21 certificate, it is a valid birth certificate?
22    Q.   Uh-huh.

Page 46

1    A.   Yes?
2    Q.   Yes.
3    A.   Okay.  And there is no additional
4  evidence and there's no error and there's no legal
5  issue such as CCA, various other?
6    Q.   That's correct.  For now, let me -- we're
7  not -- I'm not going to touch CCA.
8    A.   I'm not trying to make this difficult for
9  you.  But you understand --
10    Q.   Yes.
11    A.   -- there are so many nuances to
12 revocations, all of them.
13    Q.   Sure.
14    A.   And you're asking me someone has
15 issued -- in your hypothetical, person A is issued
16 a passport based on birth in the United States, and
17 they were issued this passport based on a valid
18 driver's license or other proof of identity, and a
19 valid birth certificate, albeit non-traditional,
20 and that case comes to us, I'm not quite sure how,
21 because I'm not quite sure what would trigger the
22 request to revoke.

Page 47

1    Q.   Let me give you an example.  It was --
2  because it's personal.  It was came -- it came to
3  you because Cuidad Juarez forwarded to you.
4    A.   I don't understand.
5    Q.   Forwarded to the legal department.
6    A.   It's personal?
7    Q.   It happened in my family.  That's why I
8  know.  Cuidad Juarez made a request and it then
9  came to the legal department.  So I sort of have an
10 idea how it came about.
11    A.   Well, if it's --
12       MS. FABIAN:  Object to form.
13       THE WITNESS:  If you can give me the case
14 and go over the case.
15 BY MR. MALDONADO:
16    Q.   No, I'm not sure why it matters where it
17 came from to you.  But if it helps, the person
18 petitioned for a Mexican citizen -- the U.S.
19 citizen petitioned for a Mexican citizen to get an
20 immigrant visa and as proof of citizenship the
21 passport was presented.  The passport had been
22 issued based on a driver's license and a birth

Page 48

1  certificate reflecting a non-traditional birth.
2  And based on that, a request was made by the
3  Department of State to provide evidence of why the
4  passport should not be revoked on the basis that
5  the person was not a citizen.
6    A.   And was the passport revoked in that
7  case?
8    Q.   No.  But I want to -- but in this -- but
9  in that case, I want to know -- I want to know
10 whether --
11    A.   I'm not quite sure why you're asking me
12 the question if we're here to talk about
13 revocations.
14    Q.   Well, because the person had a lawyer to
15 represent them.  Okay.
16       So if that file had gone to your
17 department, the legal department, and the only
18 issue present in the file was the birth certificate
19 delayed by a couple of months but less than a year
20 reflecting a non-traditional birth, would that have
21 triggered revocation?
22       MS. FABIAN:  Object to form.



Case 1:18-cv-00178   Document 19-1   Filed on 02/26/19 in TXSD   Page 14 of 45

Case 1:09-cv-00208   Document 227-3   Filed in TXSD on 03/15/13   Page 14 of 46

JONATHAN M. ROLBIN                                        February 20, 2013
CASTRO vs. FREEMAN                                              49–52

Page 49

1    THE WITNESS: Okay. Here is how I will
2 answer your question. And I think I have said this
3 before.
4        The request, whoever makes it, can come
5 in. And that request would be looked at. Okay.
6 There is no checklist.
7        However, in your statement if there is
8 valid identity and a valid birth certificate and no
9 other evidence of any kind whatsoever is presented
10 or provided, or requested and later provided,
11 whatever it is, right, I don't see how that
12 passport would get revoked.
13 BY MR. MALDONADO:
14    Q. Okay. Fair enough.
15    A. And no -- and, again, no legal issues, no
16 errors, no anything like that.
17    Q. It's fair to say that the legal
18 department -- and by "legal department" we're
19 talking about the legal department within the
20 Passport Support, just so we're not confused about
21 Ms. Fabian's department.
22    A. Or the legal department in the State

Page 50

1 Department.
2    Q. Right.
3    A. We'll call it Passport Legal, that will
4 make it very clear for me.
5    Q. Passport Legal has reviewed cases for
6 revocation where the passport holder has a birth
7 certificate reflecting a non-traditional birth.
8        Is that fair to say?
9    A. We receive all kinds of revocation
10 requests.
11    Q. I understand that.
12    A. I -- I think you were produced a stack of
13 revocation letters.
14    Q. I know, I have tabbed some of them and I
15 can give you what I think would reflect
16 non-traditional births.
17        But I just want to confirm that your
18 department has experience with those sorts of
19 cases?
20    A. Yes.
21    Q. Okay.
22    A. And what I will say is there are stacks

Page 51

1 of revocation letters for all types of cases.
2    Q. Sure.
3    A. And there are cases that we don't
4 revoke --
5    Q. That's right.
6    A. -- that go back to the requester and say,
7 and I'm paraphrasing here, "Sorry, insufficient
8 evidence to revoke."
9    Q. I just -- I prefaced the question just so
10 I understand that there is a base of knowledge from
11 which you can answer questions, because the legal
12 department has reviewed cases for revocation where
13 there has been a birth certificate reflecting a
14 non-traditional birth.
15    A. Sure. I can't recall specifics,
16 obviously, sitting here, but there are, absolutely.
17    Q. Okay. And does the department employ a
18 different standard or evidentiary basis if the
19 birth certificate was -- reflects that the
20 assistant during the birth was a midwife who was
21 convicted for fraud?
22        MS. FABIAN: Object to form.

Page 52

1        THE WITNESS: Okay. I have trouble with
2 the question for a number of reasons. One, you
3 asked me about the department and not Passport
4 Legal.
5        Two, I'm not quite sure if we're talking
6 about a revocation or we're talking about an
7 issuance or what we're talking about. Wasn't clear
8 from the question. So I can't really answer it the
9 way it's phrased.
10 BY MR. MALDONADO:
11    Q. Does the Passport legal department employ
12 a different standard or a different evidentiary
13 basis when in a revocation case the file has --
14 reflects the existence of a birth certificate
15 reflecting a non-traditional birth where the birth
16 assistant was previously convicted of fraud?
17        MS. FABIAN: Object to form.
18        THE WITNESS: The Passport legal office
19 reviews all of the evidence that it receives in a
20 revocation request, and any new evidence that's
21 provided or that it becomes aware of or that it
22 gets with that, and makes a determination based on

JONATHAN M. ROLBIN
CASTRO vs. FREEMAN

February 20, 2013
53—56

Page 53

1 the totality of those circumstances.
2        There is not one check or one instruction
3 that says we weigh this differently than that.  You
4 look at the whole case and you weigh everything and
5 you make a determination based on that individual
6 case and the facts of that case.
7 BY MR. MALDONADO:
8    Q.  But if the only evidence in the file
9 being reviewed by Passport Legal is the existence
10 of a birth certificate issued by one of the states
11 where -- reflecting a non-traditional birth where
12 the birth assistant was a midwife that was
13 previously convicted for fraud in issuing, in
14 registering individuals, would that trigger
15 revocation?
16        MS. FABIAN:  Object to form.
17        THE WITNESS:  What I can say is each case
18 is individually looked at based on the evidence
19 that comes in with the revocation.  There is no one
20 thing that is going to say this case gets revoked.
21 BY MR. MALDONADO:
22    Q.  That's the only evidence that is being

Page 54

1 forwarded to the legal, Passport legal department,
2 for revocation, the fact that in 1980 or 1990 the
3 support center did not pick up on the fact that it
4 was a non-traditional birth by a midwife who had
5 been previously convicted.  For whatever reason,
6 DHS, the consular post, CBP has forwarded that case
7 for revocation to your department.
8        If the only grounds for where revocation
9 is sought is this type of birth certificate, will
10 that -- will the passport be revoked?
11        MS. FABIAN:  Object to form.
12        THE WITNESS:  Again, if there is no new
13 evidence provided to the legal office and there is
14 no new evidence and no error and no mistake of law
15 that's been made, I don't quite understand how that
16 case would come in for revocation.
17 BY MR. MALDONADO:
18    Q.  Assuming it comes to your department.
19 Don't worry too much about how it came.  Someone at
20 DHS said, hey, you know, this midwife on this birth
21 certificate, you know, we've had experience with
22 her.  They forward it to your office through the

Page 55

1 established procedures for revocation.  No new
2 evidence other than someone just saw that birth
3 certificate and thought differently than the
4 support center when it approved the application.
5    A.  And a passport was issued in that case --
6    Q.  Yes.
7    A.  -- based on that evidence?
8    Q.  Yes.
9    A.  And there is no new evidence, no mistake,
10 no error of law, no identity, no any other type of
11 issue?
12    Q.  That's correct.
13    A.  Again, I'm not quite sure I understand
14 how that case would come in.
15    Q.  And let me see if I understand correctly
16 something.
17        Following that scenario where the only
18 thing in the file is a birth certificate reflecting
19 a non-traditional birth of a midwife who's been
20 convicted of fraud for issuing fraudulent birth
21 certificates or signing fraudulent birth
22 certificates, is it possible that the legal

Page 56

1 department would say, "No fraud except erroneously
2 issued.  Revoked"?
3        MS. FABIAN:  Object to form.
4        THE WITNESS:  I can't -- I'm sorry, I
5 can't answer that.
6 BY MR. MALDONADO:
7    Q.  I'm trying to figure out whether in the
8 determination to revoke, rather than finding that
9 the person is not a citizen, that the legal
10 department would say it was issued in error.
11        Are those two separate grounds?
12    A.  Non-citizenship and error?  Yes, those
13 are two separate grounds.
14        I'm going to need a break pretty soon.
15        MR. MALDONADO:  We can break.
16        (Recess taken at 10:06 a.m.)
17        (Deposition resumed at 10:17 a.m.)
18 BY MR. MALDONADO:
19    Q.  You had mentioned earlier that there were
20 procedures of how cases for revocation were
21 referred to you.
22        Could you be more specific and describe



Case 1:18-cv-00178   Document 19-1   Filed on 02/26/19 in TXSD   Page 16 of 45

Case 1:09-cv-00208   Document 227-3   Filed in TXSD on 03/15/13   Page 16 of 46

JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                         57—60

Page 57

1  those procedures?
2     A.  By "you," you mean to the Passport legal
3  office?
4     Q.  Yes.
5     A.  Okay.  Yes, so you're asking me about
6  outside agencies?
7     Q.  That's correct.
8     A.  Okay.  Yes, there is -- the procedures
9  are that a revocation request would come in and
10 include a memo from the agency on letterhead that
11 includes sufficient detail about the subject,
12 complete name, date of birth, place of birth,
13 Social Security number, things like that; a
14 description of the facts supporting the revocation,
15 any evidence, documents, et cetera, that support
16 the request for revocation; if there's foreign
17 documents, they need to be translated; the contact
18 person from the requesting agency, so that we have
19 someone to go back to if we need new evidence or
20 additional evidence, rather.
21        And I believe that that is what we
22 request.  So the memo could contain all of those

Page 58

1  things, plus attachments.
2     Q.  And is that procedure different for
3  requests that come within the agency, within the
4  State Department?
5     A.  No.
6     Q.  Because what you just described is for
7  DHS or CBP or some other agency, correct?
8     A.  Right, but that also applies to
9  diplomatic security, that also applies to the
10 passport agencies and centers, that also applies to
11 overseas posts, same thing, same format.
12    Q.  Okay.  Because I thought you prefaced
13 this within or without the agency.
14    A.  I did, but I realized in talking about it
15 that there is no difference.  We ask for the same
16 things.
17    Q.  Okay.  Going back to the issue of birth
18 certificates reflecting non-traditional birth, if I
19 understand correctly, I don't want to ask the
20 question again, you told me that there were no
21 guidance or written memoranda about how such
22 documents should be weighed or evaluated, correct?

Page 59

1        MS. FABIAN:  Object to form.
2        THE WITNESS:  Separate and apart from the
3  regulations, the FAM, statutes, whatever.
4  BY MR. MALDONADO:
5     Q.  Right.
6     A.  And that was memorandum within the legal
7  department, correct?
8     Q.  Correct.
9     A.  Okay.  There is no memorandum in the
10 legal department about that.
11    Q.  And is there written memoranda separate
12 and apart from the statute, regulations, and the
13 FAM, is there written memoranda about guidance
14 about how birth certificates reflecting
15 non-traditional births should be considered,
16 weighed, evaluated by the legal department?
17       MS. FABIAN:  Object to form.
18       THE WITNESS:  No.
19 BY MR. MALDONADO:
20    Q.  And are there any training videos?  We
21 talked about written memoranda, but now I want to
22 go into training videos or electronic -- any

Page 60

1  electronic medium that would be used or has been
2  used by the Passport legal department when -- to
3  consider or how to evaluate birth certificates
4  reflecting non-traditional births for purposes of
5  revocations.
6        THE WITNESS:  Can you read that back to
7  me?  Starts with the training videos.
8        (The reporter read back as requested.)
9        THE WITNESS:  There are no videos, such
10 videos that I'm aware of.  I don't know what you
11 mean by "electronic media."
12 BY MR. MALDONADO:
13    Q.  I don't know.  E-mails?
14    A.  There are no e-mails that I'm aware of.
15       MS. FABIAN:  Javier, I just want to
16 clarify, the Castellano settlement does address the
17 evaluation of --
18       MR. MALDONADO:  I think for applications.
19       MS. FABIAN:  For applications only.
20       THE WITNESS:  Right.  We're just talking
21 about revocations.
22       MS. FABIAN:  So I just want to clarify



JONATHAN M. ROLBIN                                       February 20, 2013
CASTRO vs. FREEMAN                                              61–64

Page 61

1 that those things exist, but that those are all
2 outside the scope of what we're talking about here.
3       THE WITNESS:  We're not talking about
4 adjudication of passports.  We're talking about
5 revocation of passports by the legal department.
6 BY MR. MALDONADO:
7    Q.  That's right.
8    A.  Specific training videos, specific
9 e-mails?
10    Q.  Right.
11    A.  Specific memos about how to weigh
12 evidence?
13    Q.  That's right, correct.
14    A.  That's what you're asking me about?
15    Q.  Right.  I'm aware about the application
16 stuff.
17       MS. FABIAN:  Okay.
18       THE WITNESS:  And so as far as how to
19 weigh evidence, there are no specific videos, no
20 specific e-mails, and no written memoranda that I'm
21 aware of.
22 BY MR. MALDONADO:

Page 62

1    Q.  Okay.  And does that mean also -- because
2 I am aware that under the Castellano settlement
3 agreement, some memoranda may have been prepared,
4 some guidance may have been prepared for the
5 purposes of applications of passport.
6       Those sorts of materials are not
7 considered by the revocation -- by the legal
8 department in determining revocations?
9    A.  No.  But there are adjudication materials
10 like that.  We're not -- that's for issuance.
11    Q.  That's for issuance, that's right.  And
12 those are -- I mean, those are not used by the
13 Passport legal department --
14    A.  For purposes of revocation.
15    Q.  That's correct.
16    A.  No, they are not.
17    Q.  Thank you.
18    A.  Sorry.  I didn't mean to finish your
19 question.
20    Q.  Fair enough.  From prior litigation we're
21 aware that there are -- there is a list or lists of
22 suspected midwives.

Page 63

1       Are you aware of that?
2    A.  Am I aware of what?  That --
3    Q.  A list or list --
4    A.  -- you learned of it through prior --
5    Q.  -- of suspected midwives.
6    A.  Am I ( aware that there's a list of
7 suspected midwives?  Yes.
8    Q.  What role does that list play in the
9 decision to revoke when one of those suspected
10 midwives appears on a birth certificate of a case
11 that has been forwarded to your office for
12 revocation?
13       MS. FABIAN:  Object to form.
14       THE WITNESS:  I'm not sure I can answer
15 that with one -- with a yes or no.
16       What I can tell you is that when a
17 revocation comes in, each case is looked at on its
18 own based on all of the facts and circumstances,
19 the totality of those circumstances within that
20 case.  The evidence is reviewed.  What was
21 determined at issuance and any new evidence is
22 reviewed, and the decision is made based on that.

Page 64

1       There is no checklist of it's a, for lack
2 of a better word, I think Castellano referred to it
3 as SBA list.
4 BY MR. MALDONADO:
5    Q.  Uh-huh.
6    A.  There is no checklist that it's an SBA,
7 nothing like that.
8    Q.  I know in your testimony you have been
9 saying that if there's no new evidence of that the
10 person is not a citizen and if there are no other
11 issues, it's unlikely that the department -- that
12 the Passport legal department would not recommend
13 revocation?
14    A.  I don't think I said not recommend
15 revocation.
16    Q.  Or not revoke.
17       MS. FABIAN:  Object to form.
18 BY MR. MALDONADO:
19    Q.  If I understood correctly, your testimony
20 was, look, unless there's new evidence, if there's
21 nothing new --
22    A.  Nothing new.



JONATHAN M. ROLBIN                                           February 20, 2013
CASTRO vs. FREEMAN                                                      65—68

Page 65

1    Q.  -- and the application has been approved
2 but the case has been forwarded to the legal
3 department, if there's nothing new we would not
4 revoke?
5        MS. FABIAN:  Object to form.
6        THE WITNESS:  You're asking me if that's
7 what I said?
8 BY MR. MALDONADO:
9    Q.  That was your --
10   A.  I think I'd rely more on what I said
11 earlier --
12   Q.  Sure.
13   A.  -- specifically in the transcript.  But I
14 will say it again.  I preface it with when we've been
15 here over an hour and a half, I hope I don't miss
16 it, misstate what I said earlier.
17       Which is if there is no new evidence, no
18 error, no mistake of law, no other reason as we've
19 discussed, you're nodding your head so I want to
20 make sure you're in agreement with me, no other
21 reason such like was set forth in the regulations,
22 I'm not quite sure what would be the basis for

Page 66

1 revoking the passport.
2        But it's difficult for me to answer
3 without looking at the particular case.
4    Q.  Sure.  And I'm not going to make this an
5 exhibit.  This is a -- ignore the -- I think some
6 of them we used recycled paper, so it's on
7 double-sided.  But this is what plaintiffs received
8 from DOJ for Ms. Guerrero.  Some of it is redacted,
9 but you may or may not know what it is.
10   A.  For what did you say?
11   Q.  Ms. Guerrero.
12   A.  Okay.
13   Q.  And so what was the new evidence that the
14 legal department obtained that caused it to revoke
15 Ms. Guerrero's passport?
16       MS. FABIAN:  I'm going to object to that.
17 It calls for deliberative process privileged
18 material.
19       MR. MALDONADO:  I'm asking for -- I'm
20 sorry.  Let's go --
21       MS. FABIAN:  To the extent you're asking
22 new evidence that was obtained -- well, I'm also

Page 67

1 going to object because it's vague.  When was new
2 evidence obtained?
3        And then the evidence that caused the
4 revocation, I think that would be deliberative
5 process.  I think that new evidence was obtained
6 over the course of discovery in the Guerrero case
7 is -- I mean, it's evident from the materials what
8 new evidence was obtained.
9        MR. MALDONADO:  I understand.  So there's
10 no -- I mean, I'm not sure what is privileged
11 anymore.
12       MS. FABIAN:  Well, what's privileged is
13 which pieces of evidence were considered and the
14 piece of evidence that would have been the factor
15 in determining the revocation.  I think that's
16 going to go to deliberative process privilege.
17       To the extent you want to show him the
18 letter, and that would I think constitute a final
19 decision, he can say, you know, what the letter
20 says about the factors considered in revocation.
21       MR. MALDONADO:  No, I mean, I --
22       MS. FABIAN:  But I'm not going to let him

Page 68

1 walk through the materials and say what the agency
2 considered in terms of revocation.
3 BY MR. MALDONADO:
4    Q.  Well, if I understand correctly,
5 Jonathan, your department revoked Ms. Guerrero's
6 passport; isn't that true?
7    A.  Well, do you have the revocation letter?
8    Q.  Yes.
9    A.  Can I see it?
10       MS. FABIAN:  Are we going to make this an
11 exhibit now?  Because if --
12       MR. MALDONADO:  No, I'm not making it an
13 exhibit.
14       MS. FABIAN:  If he's going to testify
15 about it --
16       MR. MALDONADO:  I'm not going to make it
17 an exhibit.
18 BY MR. MALDONADO:
19   Q.  You sent her the first one, I think had
20 the wrong name.  Not you, but your office.  Like
21 you said, typos are made.
22   A.  Right.  So do you have both letters that



JONATHAN M. ROLBIN                                February 20, 2013
CASTRO vs. FREEMAN                                69–72

Page 69

1  you could show me?
2      Q.   Yeah.
3          MS. FABIAN:  I believe the date of the
4  second one is December 17th.
5  BY MR. MALDONADO:
6      Q.   This is the one that was originally sent,
7  but it has the -- actually, could you hand it back
8  again?
9      A.   Sure.
10     Q.   I'm going to show you, Jonathan, what
11  has -- what is marked as defendant's Bates
12  number 826 and 827 for your review.  This was a
13  letter that was sent to Ms. Guerrero on December
14  14th, 2010, but it had a typo because it identified
15  her by her wrong surname.
16         And I'm going to hand to you pages Bates
17  numbered defendant 830 through 832.  It includes a
18  cover letter where you identify for Ms. Guerrero
19  the error in the greeting line and provide her with
20  a corrected letter.
21     A.   Okay.
22     Q.   And my question is what was the new

Page 70

1  evidence that the department obtained that caused
2  it to revoke the passport?
3          MS. FABIAN:  Again, I'm going to object
4  to the extent you're asking for information
5  considered outside of what's reflected in the final
6  agency decision, which is the letter.
7  BY MR. MALDONADO:
8      Q.   Well, I can provide you with the file
9  that was provided by the department.  You take a
10  look at this and tell me where I could find the
11  piece of evidence that caused the department --
12  unless this is not complete.
13         MS. FABIAN:  I don't understand.  The
14  objection would be that if you want the piece of
15  evidence that caused the -- what is reflected in
16  this letter reflects the agency's decision on the
17  revocation.  To the extent what the letter states
18  was the evidence considered by the agency, he can
19  answer those questions.
20         If there was additional considerations
21  made about additional evidence, whether it was
22  rejected but it's not reflected in --

Page 71

1  BY MR. MALDONADO:
2      Q.   I just want to know in the letter you
3  said there was evidence that she was -- that came
4  to the department that caused it to revoke the
5  passport for Ms. Guerrero.
6         What was that evidence?
7      A.   Well, in the third paragraph of the
8  letter it identifies a few things.
9      Q.   Okay.
10     A.   So we've attached the letter as an
11  exhibit.  I can read it if you want.
12     Q.   Please read it.
13     A.   Okay.  From the third paragraph, The
14  department was recently informed of an
15  investigation regarding the circumstances of your
16  birth.  The investigation uncovered a Mexican birth
17  record in the name of Ana Luisa Guerrero Ornelas
18  that lists your date and place of birth as June
19  20th, 1977, in Matamoros, Mexico.  This birth
20  record was filed on July 6th, 1977.  You provided a
21  sworn statement to U.S. Citizenship and Immigration
22  Services in which you stated that you are aware of

Page 72

1  this Mexican birth record since you were 10 years
2  old.  However, the birth record was not amended
3  until February 2nd, 2007, three days before your
4  application for a U.S. passport.  The amended
5  Mexican birth record changed your date and place of
6  birth to July 4th, 1977, Brownsville, Texas.  Based
7  on this new evidence and the totality of the
8  circumstances, we have determined that the
9  revocation of your passport is warranted.
10         And I think to be clear, there's also a
11  factual statement in the second paragraph that
12  identifies what was presented with her passport
13  application.
14     Q.   Can you read it for the record?
15     A.   Read that one too?  Sure.
16         State Department records -- and I'm
17  reading the second paragraph now.  Little out of
18  order.
19     Q.   And it's Bates number?
20     A.   DEF 00831 to 832.
21         State Department records indicate that on
22  February 5th, 2007, you executed an application for



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                            73–76

Page 73

1  a U.S. passport at the Brownsville post office in
2  Brownsville, Texas.  In support of your application
3  for U.S. passport, you presented a Texas birth
4  certificate that lists your date of birth as July
5  4th, 1977.  This birth certificate was filed on
6  August 8th, 1977.  Thereafter, U.S. passport number
7  422223297 was issued to you on April 9th, 2007.
8      Q.   And so if I understand correctly, from
9  the letter it was the existence of a Mexican birth
10  registration, which was later amended by
11  Ms. Guerrero, that among other things caused the
12  department to revoke her passport.
13       Is that fair to say?
14      A.   Among other things, yes.
15      Q.   And the other things were her statement,
16  for example?
17      A.   Well, that's one example.
18      Q.   Anything else?
19      A.   Well, as I think I've said earlier, the
20  totality of the circumstances.
21      Q.   Sure.
22      A.   Which includes all of the information

Page 74

1  that she provided at the time she applied for the
2  passport as well.
3      Q.   Okay.  And that -- and that was one of
4  the topics in the notice of deposition,
5  Ms. Guerrero's file.
6       So besides her ID, did the department
7  have any problem with her identification when she
8  applied for a passport?
9      A.   You mean did she present a valid driver's
10  license --
11      Q.   Yes.
12      A.   -- or whatever?
13      Q.   Yes.
14      A.   I don't think it says in the letter.  Do
15  you have a copy of the application?
16      Q.   I do.
17      A.   Okay.  I mean, it would say on there.  My
18  guess is it would be noted if she provided an
19  invalid driver's license.
20      Q.   That's right.
21      A.   So looking at the letter, my guess would
22  be she provided a valid driver's license.

Page 75

1      Q.   Okay.  And --
2      A.   And as long as we preface that with I
3  haven't looked at the application, that's fine.
4      Q.   And it doesn't -- the revocation letter,
5  Bates number 831 through 832, also does not
6  indicate that it was revoked because she hadn't
7  signed the passport application form, right?
8      A.   No.  It was revoked -- it is fair to say
9  that, looking at this letter, the basis for the
10  revocation were the facts and circumstances
11  surrounding her claim of birth in the United States
12  and not identity issues.
13      Q.   Okay.  This was the application itself.
14      A.   Okay.
15      Q.   And I'm going to show you what's been --
16      A.   Yeah, I'll identify.  You've given me DEF
17  00869 and 870.
18      Q.   And this is her identification.
19      A.   Okay.  That would be DEF 00871.
20      Q.   So looking at the application, do you see
21  anything on its face that was grounds for the
22  revocation?

Page 76

1      A.   Well, again, you have to look at the
2  totality of the circumstances and the evidence that
3  was presented at the time of the revocation
4  request, which would include everything within the
5  application, plus everything --
6      Q.   Right.
7      A.   -- that was subsequently provided.
8      Q.   And just looking at the application, were
9  there any problems with the application itself,
10  whether she didn't have the correct name, she
11  didn't sign the form, her address was not correct,
12  she was supplying from abroad?  Anything that
13  played a role in the revocation?
14      MS. FABIAN:  I'm going to object to form.
15      THE WITNESS:  Okay.  Well, to answer --
16  whether or not it played a role, the whole
17  application played a role.
18      What I can say is this.  So if we look at
19  it in terms of a snapshot, and the snapshot here
20  within -- and you've just handed me DEF 00742.  All
21  right.  So the snapshot of Bates number 869, 870,
22  871 and 724, I'm not quite sure why those are out



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                              77—80

Page 77

1 of order, but that snapshot of those four pages
2 indicate that at the time the application was
3 issued that was a correct issuance.
4 BY MR. MALDONADO:
5      Q.   Okay.
6      A.   Okay.  Now looking at the revocation
7 letter and nothing more, and the facts as
8 identified in the revocation letter, additional
9 evidence, new evidence, came into the department's
10 possession.  I'm not sure, I can't tell from where,
11 on this letter.
12     Q.   Did you have a chance to review the file
13 before your testimony today?
14     A.   I didn't review the file.
15     Q.   Were you aware that that was a subject
16 that you were going to testify about in today's
17 deposition?
18     A.   I was aware of the topics.  I'm not sure
19 which topic -- but you didn't let me finish my
20 answer to the question, though.
21     Q.   Okay.
22     A.   I forgot where I was before you

Page 78

1 interrupted me.  So why don't I start over.
2        Bates number 869, 870, 871, and 742
3 represent a snapshot of what the department was
4 aware of at the time Ms. Guerrero applied for a
5 passport.  And based on what you've provided me, at
6 the time of the adjudicative decision it appeared a
7 correct decision to issue the application was made.
8 She presented valid identity documents, she appears
9 to have presented a valid birth record, okay.  I
10 don't know if there was additional evidence
11 provided, but this is what you've given me.
12       Subsequent to that issuance, new evidence
13 came in, as indicated in the revocation letter.
14 And that new evidence included a foreign birth
15 record showing that she was born not in the United
16 States but in a foreign country, Mexico; and a
17 sworn statement that she provided to U.S. CIS; and
18 another fact that she had amended the birth record.
19       So that new evidence was then looked at,
20 in addition to the evidence she provided at the
21 time she was issued the application.  And based on
22 the totality of those circumstances, it would

Page 79

1 appear that that was the basis for the revocation
2 of the passport.
3      Q.   Okay.  That's fair enough.  I just want
4 to confirm that those were the facts that, in
5 combination with the totality of the evidence, that
6 led to the revocation.
7      A.   Totality of the evidence and
8 circumstances.
9      Q.   Right, okay.  And so then did she go to a
10 hearing to appeal that decision?
11     A.   No.
12     Q.   Why not?
13     A.   Well, you asked me if she went to a
14 hearing, and I think --
15     Q.   Did she go --
16     A.   I don't know whether she went to a
17 hearing or not.
18     Q.   Did she administratively appeal that
19 decision to revoke?
20     A.   Did she?  I have no idea whether she made
21 a request to do so or not.
22     Q.   Could she?

Page 80

1      A.   Okay.  No, she could not.
2      Q.   And that -- and explain to me why she
3 could not have administratively appealed the
4 decision to revoke her passport.
5      A.   Okay.  Under our existing regulations,
6 she was -- her passport was revoked on the basis of
7 non-nationality.  And in section 5170 through 5174,
8 that is not a basis for a review hearing.
9      Q.   And can you cite for me the statute or
10 the statutory provision that authorizes the
11 department to deny review of a revocation that is
12 made under 51.62(b)?
13     MS. FABIAN:  I'm going to object to the
14 extent you're calling -- asking him to make a legal
15 evaluation --
16     MR. MALDONADO:  Sure.
17     MS. FABIAN:  -- of the regulations.
18     MR. MALDONADO:  I'm just asking for him
19 to identify something.
20     THE WITNESS:  I'll not sure what you're
21 asking me to identify.
22 BY MR. MALDONADO:



JONATHAN M. ROLBIN                                           February 20, 2013
CASTRO vs. FREEMAN                                           81–84

Page 81

1    Q.   If you could identify for me the
2 statutory provision for the regulation that you
3 just quoted to me that does not allow for
4 administrative review of the revocation decision.
5    A.   There is no statute that requires review
6 under this circumstance.
7    Q.   Okay.
8    A.   There is no statute that requires State
9 Department review under this circumstance.
10   Q.   I'm trying to figure out, I blanked out
11 on what the -- where the State Department statutes
12 is.  Is it in 8 USC as well?  I don't know.
13 Wherever the statutes regarding passport, I think
14 it's 8 USC something.
15        Anyway, are you aware that at a later
16 date the legal department rescinded its decision to
17 revoke the passport?
18   A.   I wouldn't use the term "rescinded."
19   Q.   How would you describe that?
20   A.   I would say that the department -- the
21 legal department made a later determination that --
22   Q.   Made a labored determination?

Page 82

1    A.   Later determination that, based on
2 additional evidence that was provided subsequent to
3 the revocation, new evidence, that Ms. Guerrero was
4 entitled to a passport.
5    Q.   And what was that new evidence?
6        MS. FABIAN:  And, again, I'm going to
7 object to the extent you're asking him to identify
8 the information that was the basis for the
9 re-issuance.
10       He can identify new -- to the extent he's
11 aware, he can identify the new evidence that came
12 in through discovery in the case, but I'm going to
13 ask him not to identify exactly the evidence that
14 was the basis for the re-issuance.
15 BY MR. MALDONADO:
16   Q.   I'm only asking about the facts.  I'm not
17 asking about how it was weighed, what deliberative
18 process went into weighing it.
19       I just want to know what were the new
20 facts that came to the department that changed its
21 decision to revoke Ms. Guerrero's passport?
22   A.   I'd have to take a break, I think, and

Page 83

1 just review -- do you have --
2    Q.   You're not going to be able to read
3 anything that I have here.  I'll give it to you.
4    A.   It's all redacted?
5    Q.   Hmmm?
6    A.   It's all redacted?
7    Q.   Yes.
8    A.   Well, my recollection is that
9 Ms. Guerrero, subsequent to being revoked, filed a
10 lawsuit.  And I believe during the course of that
11 lawsuit additional evidence was provided.
12       Without actually reviewing the litigation
13 file, my recollection is a little fuzzy.  I deal
14 with a lot of revocation cases, in addition to all
15 the other duties.
16       But I think there were -- I believe there
17 was deposition -- there was deposition testimony.
18 And I can't recall specifics right now off the top
19 of my head, but there was additional new evidence
20 that had not been provided to the department that,
21 when looked at in the totality of the
22 circumstances, we made a determination that

Page 84

1 Ms. Guerrero had in fact now established a claim,
2 her claim to birth in the United States.
3    Q.   And --
4    A.   And what I will add is this.
5 Ms. Guerrero at any time -- her revocation,
6 although that is a final decision on that passport
7 number, she is always and was always free to
8 reapply and submit whatever additional evidence she
9 had.
10   Q.   And I won't make you do that, but maybe
11 when we take a short lunch break I would ask you if
12 you -- if it's possible for you to review her file
13 to see what was that new evidence.
14   A.   Sure.
15   Q.   Because it was -- you know, I got -- I
16 got black papers, that's all I got.
17   A.   So you have a stack of documents there.
18 What's the Bates number on them?
19   Q.   It goes from 725 through 891, I believe.
20       MS. FABIAN:  There were -- just for the
21 record, there were also additional documents for
22 Guerrero identified in discovery responses that



Case 1:18-cv-00178   Document 19-1   Filed on 02/26/19 in TXSD   Page 23 of 45

Case 1:09-cv-00208   Document 227-3   Filed in TXSD on 03/15/13   Page 23 of 46

JONATHAN M. ROLBIN                                        February 20, 2013
CASTRO vs. FREEMAN                                              85–88

Page 85

1  were already in the possession of plaintiff.  So
2  there's additional documents that should provide an
3  answer to your question and we can review those.
4  But those were identified in discovery responses
5  and should be in the plaintiff's possession because
6  the same counsel participated in Ms. Guerrero's --
7      MR. MALDONADO:  I understand.  But you
8  and I had a conversation and I asked for a complete
9  file.  And you kindly said I will send you what was
10  previously provided to other counsel.  And this is
11  what I got.  So --
12      THE WITNESS:  Right, but that wouldn't
13  necessarily include everything that was produced
14  during the course of discovery, would it?
15      MS. FABIAN:  I think with regard to
16  Guerrero, what we produced was the complete
17  passport file at this time.
18      And if you look at the discovery
19  responses, I also identified with some specificity
20  the additional documents that were in the file,
21  anything that was in -- and I won't -- I don't
22  remember the exact language, but other documents

Page 86

1  that were exchanged during the course of the 1503
2  litigation for Ms. Guerrero that were also
3  responsive to the document requests.
4      MR. MALDONADO:  And I think it had to do
5  with a settlement agreement and other stuff like
6  that.  I don't think there was anything related to
7  the individual passport file or revocation file
8  that was identified in the defendant's responses.
9      So this is all I have that I understood
10  the legal department had when it made its decision
11  to revoke.
12      MS. FABIAN:  And that's not true, because
13  if you look at the discovery responses, at some
14  point defendant stated that in addition the
15  Department of State had in its possession all
16  documents that were filed or produced or generated
17  during discovery that were -- that were also now in
18  the possession of plaintiffs.  And this included
19  deposition testimony and additional documents that
20  plaintiffs produced to the Department of State, and
21  so they're already in plaintiff's possession.
22  BY MR. MALDONADO:

Page 87

1      Q.  So, Jonathan, your department would have
2  those new facts that caused the department to at a
3  later date change its decision, correct?
4      A.  I don't know what you're asking me.
5      MS. FABIAN:  Object to form.
6      THE WITNESS:  Would have those new facts?
7  BY MR. MALDONADO:
8      Q.  That you would have the documentation
9  reflecting those new facts that caused the
10  department to change its decision to revoke
11  Ms. Guerrero's passport.
12      A.  You mean like if there was a lawsuit
13  would we have depo transcripts?
14      Q.  Yes.
15      A.  Sure.
16      Q.  I mean, if that's what the -- if that was
17  a new fact that caused the department to change its
18  mind, that would -- you would have that, correct?
19      A.  Yeah, we would have that.
20      Q.  Okay, okay.  So I'm not going to ask you
21  to stand up right now and look at it, but when we
22  have a short break I will return to request --

Page 88

1  again, the question is what were those new facts
2  that caused the department at a later date to
3  change its decision to return Ms. Guerrero's --
4      A.  To reissue a new passport.
5      Q.  That's right.
6      A.  Because we revoked that number.
7      Q.  Right.
8      A.  Okay.
9      Q.  To issue a new passport.
10      Taking Ms. Guerrero's case as an example,
11  that question, the issue of the new -- the Mexican
12  birth registration, how did it come to the
13  attention of the legal department?
14      A.  How did -- you're talking about paragraph
15  3 of the letter?
16      Q.  Yes.
17      A.  How did that come to our attention?
18      Q.  Yes.
19      A.  Well, it came from an outside source or a
20  consular post, somewhere like that.  Somebody sent
21  that to us.
22      Q.  And --



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                                89–92

Page 89

1    A.   And CIS, as it says in the letter, it
2  looks like a sworn statement was given to CIS, so
3  it may have come in from CIS, U.S. CIS.
4    Q.   Okay.  And is it always the case where
5  there are foreign-issued birth registrations, in
6  this case let's just talk about Mexico, that the
7  legal department would only become aware of that
8  through DHS?
9    A.   No.
10    Q.   What other source -- how else would the
11  legal department become aware of a foreign-issued
12  birth certificate to someone who's claiming to be a
13  U.S. citizen?
14       MS. FABIAN:  I'm going to object as asked
15  and answered.
16       THE WITNESS:  It can come from any
17  source.
18  BY MR. MALDONADO:
19    Q.   Sure.
20    A.   Sometimes it comes from the person
21  themselves.
22    Q.   Right.  Does the fact that the passport

Page 90

1  holder did not reveal or disclose the existence of
2  a foreign birth certificate, does that fact play a
3  role in the evaluation or decision to revoke a
4  passport in the totality of circumstances?
5    A.   That is a fact, right.
6    Q.   Before you go, why is that?
7    A.   You didn't let me finish.
8    Q.   I know, I know.
9    A.   I can't answer two questions at once.
10       MS. FABIAN:  I'd like him -- let him
11  finish his answer first.
12       THE WITNESS:  So you're ask -- can you
13  repeat the first question?
14       (The reporter read back as requested.)
15       THE WITNESS:  Okay.  So as I think I've
16  said before, when revoking a passport we look at
17  all of the evidence, new and before, the new
18  evidence and the evidence that was provided at the
19  time.
20       There are a number of facts that may play
21  a role in evaluating or weighing the evidence.  And
22  what you mentioned is a fact, not the fact, but a

Page 91

1  fact, if you understand that distinction.
2  BY MR. MALDONADO:
3    Q.   Yeah.  I did not say "the."  I said did
4  that fact play a role?  I'm not saying it's a
5  determinative role.
6       Did it play -- does the fact that a
7  passport holder does not disclose at the time of
8  application that they have a foreign-issued birth
9  registration play a role in the decision to revoke?
10    A.   I think I -- as I said before, it is a
11  fact that is considered.
12    Q.   And my question is why is that?  Why does
13  it play any role?
14    A.   Well, I think that goes into how we
15  deliberate particular things.
16       But I think each fact that we're aware
17  of, if the person is claiming -- if we're talking
18  about a case, a hypothetical case where the person
19  is claiming birth in the United States, then all of
20  the facts and circumstances surrounding those
21  claims play a role in evaluating the evidence and
22  weighing the evidence.

Page 92

1    Q.   Let me ask you, does the fact that the
2  person did not disclose at the time that they
3  applied for a passport that they had a birth
4  certificate from a foreign country, would that fact
5  tend to -- would that fact make it more likely that
6  the passport be revoked or less likely that it
7  would be revoked?
8       MS. FABIAN:  Object to form.
9       THE WITNESS:  Yeah, I can't answer that.
10  I think you have to look at the totality of the
11  circumstances and see what's presented in the
12  particular case.  It is a fact that would be
13  considered.
14  BY MR. MALDONADO:
15    Q.   Right.  But is it -- in the case is it a
16  plus or a minus fact?  Is it a positive or a
17  negative factor in the evaluation?
18       MS. FABIAN:  Object to form.
19       THE WITNESS:  I don't know what you mean
20  by "positive" or "negative."  Positive for negative
21  for who, the applicant, for the department?
22  BY MR. MALDONADO:



JONATHAN M. ROLBIN                                     February 20, 2013
CASTRO vs. FREEMAN                                              93—96

Page 93
1    Q.   Positive or negative tending to revoke.
2    A.   I still don't understand what you known
3  by positive or negative.
4    Q.   Does the fact that a person did not
5  disclose the existence of a foreign-issued birth
6  certificate be weighed as a factor favoring
7  revocation?
8    A.   Again, there is no one particular thing.
9  Each fact is looked at, we look at the totality of
10  the circumstances.
11      I can't say that, you know, we would make
12  a check and say, "Oh, that's it, that person gets
13  revoked." Everything is looked at individually in
14  terms of the whole story, the whole picture that we
15  have presented before us in that snapshot.
16    Q.   Yes. And everything is seen and some of
17  the evidence might tend to -- might tend to be in
18  favor of revocation and some evidence might tend to
19  suggest that the passport shouldn't be revoked.
20      MS. FABIAN: Object to form.
21  BY MR. MALDONADO:
22    Q.   Is that fair to say?

Page 94
1    A.   I think that's fair to say. I think the
2  difficulty is when you're asking me about one
3  particular thing, because everything has to be
4  looked at in the whole picture.
5    Q.   I understand that. But, you know, not --
6  I mean, it's not a neutral fact, correct? I mean,
7  it has -- it's not a fact that has no value.
8      In other words, the fact that the person
9  didn't disclose it, you're not just going to throw
10  it away and say, "I'm not going to consider it"?
11      MS. FABIAN: Object to form.
12      THE WITNESS: Yeah, I'm not sure I
13  followed that.
14  BY MR. MALDONADO:
15    Q.   Sure. The fact that the person did not
16  disclose the existence of a foreign-issued birth
17  certificate, it's not a neutral fact. In other
18  words --
19    A.   It is a fact that's considered,
20  absolutely.
21    Q.   It's a fact that's considered.
22    A.   Absolutely.

Page 95
1    Q.   But in terms of how it's considered, is
2  it a fact that is considered tending to show that
3  the person is not a national or tending to show
4  that the person is a national?
5      MS. FABIAN: Object to form.
6      THE WITNESS: If they didn't disclose --
7  there are -- the difficulty I'm having is there are
8  more facts that you're not discussing, which is not
9  only was it not disclosed, but a birth record
10  existed as well, right?
11  BY MR. MALDONADO:
12    Q.   Right.
13    A.   And was subsequently discovered. So
14  those two facts right there would tend to -- they
15  would not support issuance of a passport, I would
16  say.
17    Q.   Would they support revocation?
18    A.   They would be two facts that would be
19  looked at in the totality of the circumstances.
20  They certainly wouldn't rule against revocation.
21      Without -- well, that's fine.
22    Q.   Without individual cases, it's very

Page 96
1  difficult to discuss, I understand. But I didn't
2  get it. So --
3    A.   You didn't get what?
4    Q.   We'll have a chance, hopefully we'll have
5  a chance to talk about them, but not today.
6      Going back to this list of SBAs that we
7  talked about, or suspected midwife birth
8  attendants, you recall that testimony?
9    A.   Uh-huh, yes.
10    Q.   Does the -- what guidance is given to
11  your staff about how they should view birth
12  certificates where one of these birth attendants
13  appears -- that was on the list appears on the
14  birth registration in a case that has been
15  forwarded to your office for revocation? And I
16  know that there's nothing written and there's no
17  training or e-mail, but what guidance verbally is
18  given to the adjudicators?
19    A.   The lawyers --
20    Q.   Yes.
21    A.   -- and paralegals. The guidance that's
22  given is to look at the totality of the



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                            97–100

Page 97

1 circumstances. The fact alone that a birth
2 attendant is on an SBA list is not in and of itself
3 first and foremost, and everybody's familiar with
4 this because of Castellano, a reason to deny a
5 passport. And it is not in and of itself a reason
6 to revoke a passport.
7      Q.  Turning to the issue of the existence of
8 foreign birth certificates for U.S. passport
9 holders, that's where I'm going to be asking some
10 questions now.
11         Can we agree on that?
12     A.  Okay.
13     Q.  In cases where there is a U.S. birth
14 registration and, for example, a Mexican birth
15 registration, what weight is given to the order in
16 which the particular birth registration came first,
17 whether the Mexican birth certificate, birth
18 registration, came before the U.S. birth
19 registration?
20         MS. FABIAN:  Object to form.
21         THE WITNESS:  There is no set standard.
22 You have to look at the totality of the

Page 98

1 circumstances. You have to look at the whole case.
2 BY MR. MALDONADO:
3      Q.  In every case where Passport Legal
4 decides to revoke, before revoking do they request
5 additional evidence from the passport holder?
6      A.  No.
7      Q.  Why not?
8      A.  The revocation is based on the evidence
9 that the department becomes aware of. It's a
10 snapshot and we don't go back and continue to
11 request evidence.
12     Q.  But it's based only on the evidence that
13 exists at the time of the application and any
14 evidence that may have been uncovered by the source
15 forwarding the case for revocation to your office,
16 correct?
17     A.  And any additional items we may ask from
18 the requester, which as I said sometimes we go back
19 and we ask for more from the requester. But, yes,
20 it is all of that.
21     Q.  I just don't see it in the regs where you
22 request -- I know in CIS, for example, DHS, when

Page 99

1 the benefit is going to be denied, they issue a
2 notice of intent to revoke, tell us why it
3 shouldn't be revoked.
4         Are you telling me that your office does
5 that in some cases but not others?
6      A.  I'm telling you that our office isn't
7 required to do that. And I don't think you're
8 understanding my testimony.
9         First and foremost, our regulations don't
10 require that we go to the subject and ask for more
11 evidence.
12         Second, what I was referring to was not a
13 request for more evidence from the subject, it's a
14 request from the person, the agency that's making
15 the request for revocation.
16     Q.  Oh, I didn't understand.
17     A.  So I think that's where the disconnect
18 was.
19     Q.  So the decision to revoke is based solely
20 on what the -- what was presented originally during
21 the -- at the time of the passport application was
22 made, and whatever evidence the source provides to

Page 100

1 Passport Legal, correct?
2      A.  Uh-huh, yes. And whatever other evidence
3 may exist that we become aware of.
4      Q.  How?
5      A.  Well, I don't know. I think we mentioned
6 earlier litigation. So there's an example where
7 new evidence came in through a lawsuit and the
8 department, Passport Legal, became aware of that
9 new evidence.
10     Q.  Right. But just maybe so it's clear, you
11 don't have investigators going out there to uncover
12 additional evidence?
13     A.  No, we don't.
14     Q.  Do you -- does Passport Legal have staff
15 in consular posts abroad to investigate birth
16 registrations abroad?
17     A.  Consular posts abroad do have that
18 capability and may be asked to do that in
19 situations, sure, or to verify things.
20     Q.  I don't know if I asked you this, but I
21 asked you about guidance, written guidance or
22 memoranda for birth registrations that reflect a



JONATHAN M. ROLBIN                                February 20, 2013
CASTRO vs. FREEMAN                                        101–104

Page 101

1 non-traditional birth and your testimony was none
2 existed.
3      Do you recall that?
4   A.  Yes.
5   Q.  And is there written guidance, and maybe
6 I did ask you, or memoranda about how to evaluate
7 where a passport holder has a foreign-issued birth
8 registration?
9   A.  For purposes of revocation?
10  Q.  For purposes of revocation.
11  A.  Not that I'm aware of.
12  Q.  Okay.  And when those -- if you can
13 explain to me, when a referral is made to Passport
14 Legal for revocation, can you walk me through how
15 those files are organized?  Where are they kept?
16 Does it come to a particular person in your unit?
17 And is it given a different number than the
18 passport number or whatever, maybe a referral
19 number?  I want to know sort of the process of how
20 these referrals, how these referrals are
21 maintained.
22  A.  How they're maintained or how --

Page 102

1   Q.  How they're first -- how they're
2 processed when they come in.
3   A.  Okay.  So they can come in by e-mail, by
4 fax, or by mail.  If they come in by fax or by
5 mail, they're received by the legal, for lack of a
6 better word, our secretary.  I should call her my
7 assistant, otherwise I'm in trouble.  And she would
8 distribute it to the division chief.
9      If they come in by e-mail, that e-mail
10 box is monitored by the division chief, who's a
11 lawyer with 20-plus years experience.
12  Q.  The legal chief, you?
13  A.  No, no, no.  I'm the director.  She's my
14 subordinate.
15  Q.  I see.
16  A.  Okay.  So it would get to the division
17 chief.  She then reviews the request.  She does a
18 triage, for lack of a better word.
19      And we're talking about all revocations
20 here?
21  Q.  Yes.
22  A.  Yes?  Okay.

Page 103

1   Q.  Actually, no, I'm sorry.  Let's just
2 focus on 51.62(b).
3   A.  Non-citizenship revocations?
4   Q.  That's right.
5   A.  Okay.  Which can include claims of birth,
6 which can include diplomatic children, which can
7 include people who've had their naturalization
8 certificates cancelled, certificates of
9 citizenship, whatever, things like that.  Okay.
10      Those particular cases are triaged by the
11 division chief and then she assigns them out.
12      They are put into a case management
13 system.  There's a file number for purposes of the
14 case management system, but they're kept by name.
15 And a file is created, for lack of a better word, a
16 paper file.
17      She assigns it to either an attorney or a
18 senior paralegal who has adjudication experience.
19 They would then review the case, review the
20 evidence.
21      And at that point, you know, several
22 things can happen, right?  They can decide that

Page 104

1 there's insufficient evidence and they can go back
2 to the requester and ask for additional evidence.
3 They can review the evidence that's provided, make
4 a determination that the preponderance has been
5 made and the passport should be revoked, in which
6 case they draft a letter for my signature.
7      That letter and -- so we'll go each step.
8 Okay?
9   Q.  Yes.
10  A.  So if the -- let's deal first with
11 insufficient evidence.
12      If there's insufficient evidence, they'll
13 go back to the requester.  The guidance is to give
14 the requester a certain amount of time.  We don't
15 leave these open forever.
16      If the requester does not provide that
17 additional evidence, then the case would -- they
18 would make a recommendation.  Either if it's within
19 the department a memo would be created, if it's
20 outside the department a letter would be created
21 for my signature.  Either one's for my signature.
22 And it would send the case back and say we're not



Case 1:18-cv-00178   Document 19-1   Filed on 02/26/19 in TXSD   Page 28 of 45
Case 1:09-cv-00208   Document 227-3   Filed in TXSD on 03/15/13   Page 28 of 46

JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                         105–108

Page 105

1  revoking it.
2         Now, when that happens, okay, that would
3  go from the first person that receives it to the
4  division chief, who then reviews the whole package.
5  At that point she can agree with the recommendation
6  or she can send it back to them.  Maybe, you know,
7  whatever her reasons are.  Okay.
8         If she agrees with it, then it comes to
9  me.  I look at the whole package.  If I agree with
10 things, I sign the memo, I sign the letter, it goes
11 back to the requester, says case closed.  Right.
12 If I disagree, it can go back down the chain.
13        All right.  Make sense?
14 Q.  Yes.
15 A.  Okay.  In the case of an instance where
16 we decided that the case does not meet the
17 preponderance standard and we are denying
18 revocation, slightly different from the one where
19 we request more evidence, again a memo or a letter
20 is prepared going to the requester saying that
21 there is insufficient evidence to revoke the
22 passport.

Page 106

1         That letter or memo and the package,
2  which would be the file, make its way to the
3  division chief.  She reviews it, makes -- if she
4  agrees with it, it moves forward to me.  If she
5  disagrees with it, it goes back for further
6  discussion.  Right.  And we're not a large office,
7  so there's a lot of dialogue that goes on as well,
8  if there's disagreements.
9         Anyway, so eventually if it makes it to
10 me and I support the decision, a memo or a letter
11 signed by me goes out to the requester denying the
12 revocation.
13        Then the third instance is the person
14 either gets more evidence back from the requester
15 or based on what was provided decides revocation is
16 appropriate.  They draft an appropriate letter.
17 That letter is sent to the division chief, along
18 with the whole package for review.  If she agrees
19 with the decision, it moves to me.  If she
20 disagrees with the decision, it goes back.
21        If she agrees with the decision, it comes
22 to me.  If I agree with the decision, I sign the

Page 107

1  letter, it goes out.  If I disagree with the
2  decision, it goes back to the division chief.
3         That's the process for all of these types
4  of revocations.
5  Q.  Okay.  And that is -- the process you
6  described is true whether the revocation is for
7  purposes of non-citizenship, diplomats, or I forget
8  the other ground that you mentioned.  Fraud, let's
9  say.
10 A.  I didn't mention fraud, but that's a
11 whole separate thing.  It can be non-citizenship
12 based on claim of birth in the United States.  It
13 can be non-citizenship based on that the child is
14 the child of a diplomat, although if the child is
15 the child of a diplomat there is one other process
16 that I didn't mention, which is we do go out to
17 other offices to verify the diplomatic status of
18 the parents.  Okay.
19        But absent that, the process is the same.
20 Q.  And within the lawyers --
21 A.  And it would include people also who have
22 multiple claims of birth or whatever.

Page 108

1  Q.  Right.  And within the legal department,
2  Passport Legal, you mentioned there are several
3  lawyers who are reviewing these cases, the
4  revocation cases.  That's all we're talking about.
5  A.  Okay.
6  Q.  I know that you mentioned that it's a
7  small staff.
8         Are some of those lawyers assigned only
9  to do non-citizenship or only to do diplomat or
10 only to do existing --
11 A.  No.  Every lawyer does revocations.
12 Q.  And are all these -- you say sometimes
13 you get the referral by e-mail, sometimes by mail,
14 I think sometimes by fax.
15 A.  Rarely by mail.
16 Q.  Sometimes by fax, you said.
17 A.  Rarely by fax.
18 Q.  So and that -- you mentioned that they're
19 tracked but they're generally -- they're -- you,
20 not treat them, but you work with them using the
21 last name of the passport holder.
22        You don't use that tracking number that



JONATHAN M. ROLBIN
CASTRO vs. FREEMAN

February 20, 2013
109–112

Page 109
1 might be given initially when they first came to
2 your office, right?
3    A.  Right.
4    Q.  And these cases, once your office is done
5 with the case, whether it is sending it back to the
6 source saying there's not sufficient evidence,
7 that's the end, or revoking the passport, these
8 cases, are they kept electronically in your unit or
9 are they forwarded somewhere else?
10    A.  They're not kept -- they're not
11 maintained -- the complete file is maintained in
12 hard copy.
13    Q.  It's maintained in hard copy?
14    A.  Yeah.
15    Q.  And whether -- whether it is -- let's
16 just treat right now where you return it to the
17 source saying there's not sufficient evidence.
18        Do you still keep a hard copy in your
19 file, in your offices?
20    A.  Yes.  That is the process.
21    Q.  And is it fair to say that it's organized
22 by last name?

Page 110
1    A.  It is.
2    Q.  And is it also organized by year?
3    A.  No.
4    Q.  And in the case of where Passport Legal
5 decides to revoke, independent of what may happen
6 afterwards, whether there's a District Court case
7 or a new application, I don't care what may happen
8 afterwards, does your office keep a hard copy
9 of that revocation here in your office?
10    A.  There should be a revocation file for
11 that person.
12    Q.  And is it also the case that it is
13 maintained by last name?
14    A.  Yes.
15    Q.  And it's not distinguished based on
16 years, it's just kept alphabetically by last name?
17    A.  Correct.  And it's not -- I should
18 clarify, it's not distinguished by revocation case.
19    Q.  Right.  Oh, I see.  Okay.
20    A.  We have files for all the things that
21 Passport Legal does.  So it's just put in there by
22 name.

Page 111
1    Q.  Is there -- do you maintain an index of
2 the files that are in storage?
3    A.  The files aren't in storage.  They're
4 kept in the office.
5    Q.  Well, in storage in your office.
6    A.  Well, we have an electronic case
7 management system that would maintain, I think,
8 some sort of an electronic index.  But I don't
9 believe the division chief maintains a hard copy
10 index.
11    Q.  Okay.
12    A.  But I don't know the answer to that.
13    Q.  Sure.  In this case management system is
14 called what?
15    A.  ProLaw.
16    Q.  Prologue?
17    A.  ProLaw, L-A-W.
18    Q.  And can you tell me what are the sorts of
19 fields that exist in ProLaw that are completed to
20 describe -- or filled in to describe the file?
21    A.  I am not prepared to answer that.  I'd
22 have to look.  I'd have to go get you that

Page 112
1 information.  I don't know the answer, the
2 specifics.
3    Q.  Okay.  Or who would be the person who
4 knows how those files are -- how the --
5    A.  Well, I know who I can ask and get you
6 that information.
7    Q.  Okay.  I may not have a second bite at
8 you, so that's -- if I don't get a second bite at
9 you, I need to know who would that be.  I don't
10 want to put you on the spot.  If you don't want to
11 bring that person, that's fine, if you want to at
12 lunchtime find that out.
13    A.  Yeah, I can find that out for you.
14    Q.  If you just give me the name, I promise I
15 won't hunt them down.
16    A.  No, just tell me what you want.  You want
17 to know if -- within ProLaw, how the cases are
18 identified?
19    Q.  That's right, what case information is
20 put in ProLaw to identify what the case is about?
21    A.  Okay.
22    Q.  And how long has ProLaw been used?



JONATHAN M. ROLBIN
CASTRO vs. FREEMAN

February 20, 2013
113–116

Page 113

1    A.  Okay.  I don't want to get too far
2 afield, because ProLaw is a case management system
3 not limited to revocations.
4    Q.  Uh-huh, okay.
5    A.  So you should understand that.  It has a
6 lot -- it is used as a case management system for
7 the office.
8    Q.  But do you know for certainty whether
9 there's a field in ProLaw that would identify the
10 case as being a revocation case?
11    A.  I don't know that for certain.
12    Q.  Okay.  I need to know or talk to someone
13 about that.
14    A.  Okay, okay.
15    MR. MALDONADO:  Okay, Sarah?
16    MS. FABIAN:  Yes.
17    THE WITNESS:  ProLaw has not been in
18 existence long.
19 BY MR. MALDONADO:
20    Q.  How long has it been in existence?
21    A.  2011-ish, probably.  Sometime in 2011 it
22 was --

Page 114

1    Q.  Sometime after you started --
2    A.  Yes.
3    Q.  -- with the department?
4    A.  Definitely sometime after I started.
5    Q.  So what did they do before?
6    A.  Before, I believe the files were kept in
7 hard copy at people's desks.
8    MS. FABIAN:  Would it help, would we be
9 able to print out, like, an entry page on ProLaw?
10 Would that -- we'll see what we can do.  It's my
11 understanding, from having looked into it when you
12 and I discussed, that it's not possible to identify
13 them as revocations, but we'll confirm that.
14 BY MR. MALDONADO:
15    Q.  Okay.  Can you say on average, just total
16 51.62(b) revocations, on average how many are done
17 each year or handled or reviewed?
18    A.  I couldn't give you a good estimate if
19 you'd limit it just to 51.62(b) cases.
20    Q.  You don't know?
21    A.  I don't know that off the top of my head.
22    Q.  How about total, all types of

Page 115

1 revocations?
2    A.  Since my tenure?
3    Q.  Uh-huh.
4    A.  What year are you asking about?
5    Q.  I guess you started in 2011.
6    A.  I started in 2010.
7    Q.  2010.
8    A.  I don't want to guess, but a rough
9 estimate would be in 2010 we probably did 4 to 600
10 that were revoked.  That doesn't count the ones
11 that were sent back, were not revoked.
12    In 2011, these are calendar years, not
13 fiscal years, we probably did 6 to 800.  And I
14 would say in 2012 we probably did 800 to maybe a
15 thousand.  And those are rough estimates.
16    Q.  That's fine.  But it seems from your
17 testimony that the number of revocations has
18 increased over the past three years.
19    Is that fair to say?
20    A.  That is fair.
21    Q.  And can you give me a sense of why that
22 is?  What's the reason for the increase?

Page 116

1    A.  Yeah, the reason for the increase is that
2 the processes that were set up by me to do better
3 outreach to sources for revocations to better
4 process revocations, I believe is the reason for
5 that.
6    Q.  And do you have a sense --
7    A.  And what I can say is you asked me about
8 51.62(b)s, but what I can tell you is this.  The
9 majority, and I think the large majority of the
10 revocations, are not 51.62(b)s.
11    Q.  Okay.  But going back, I think you
12 couldn't differentiate between 52.62(a), 51.62(a)
13 and 51.62(b).
14    So when you said 4 to 500 and 600 to 800,
15 and 800 to a thousand, these were all types of
16 revocations, right?
17    A.  Right.
18    Q.  Okay.
19    A.  But we do a lot of revocations for
20 warrants.  That is a large chunk of the revocation
21 work that my office does, deals with felony
22 warrants and passports that have to be revoked.



JONATHAN M. ROLBIN                                        February 20, 2013
CASTRO vs. FREEMAN                                              117–120

Page 117

1    Q.   I lost my train of thought here.
2    A.   Then I succeeded.
3    Q.   Going back to you said it had to do with
4  your outreach.
5        Do you have a sense of what source has --
6  is most responsible for referrals for revocations?
7    A.   Law enforcement.
8    Q.   Warrants?
9    A.   Warrants, court orders, things like that.
10 Court orders precluding people from traveling
11 internationally.
12   Q.   I mean, I thought that, like, if a
13 District Court denatzes a person, that that
14 information automatically is sent to your office.
15       It's not?
16   A.   (Shakes head side to side.)
17   Q.   Or was not in the past?
18   A.   I'm shaking my head no.
19   Q.   Is your office prevented from revoking a
20 passport where a certificate of citizenship by DHS
21 that was issued has not been revoked or cancelled?
22       MS. FABIAN:  Objection for form.

Page 118

1        THE WITNESS:  I'm sorry, so in your
2  example -- I can't follow the question as you've
3  phrased it.
4  BY MR. MALDONADO:
5    Q.   Is your office prevented from revoking a
6  passport where the passport holder also holds a
7  certificate of citizenship from DHS that has not
8  been cancelled?
9    A.   They hold a valid certificate?  In other
10 words, the person -- we get a revocation request
11 and a person holds a valid certificate of
12 citizenship?
13   Q.   Correct.
14   A.   Okay.  The answer to your question is we
15 are not precluded from revoking.
16       To clarify, there may be -- there are two
17 reasons you get a passport, identity and
18 citizenship.  A certificate of -- a valid
19 certificate of citizenship is proof of citizenship.
20 It is not proof of identity.  If there are identity
21 issues, passport can be revoked.
22   Q.   And if there are no identity issues, can

Page 119

1  Passport Legal still revoke a passport where the
2  passport holder has a certificate of citizenship
3  issued by DHS that has not been cancelled?
4    A.   We would not.
5    Q.   Why not?
6    A.   As I've just said, it's proof of
7  citizenship.
8        MR. MALDONADO:  Let me do this.  Let me
9  take the lunch break now.
10       MS. FABIAN:  Okay.
11       MR. MALDONADO:  I know it's early.
12       THE WITNESS:  I'm always hungry, so
13 that's okay.
14       MR. MALDONADO:  We're off the record.
15       (Lunch recess taken at 11:29 a.m.)
16       (Deposition resumed at 12:17 p.m.)
17 BY MR. MALDONADO:
18   Q.   Can you clarify something?  The Passport
19 Fraud section is different and performs different
20 functions than the -- than the department of --
21 than your department, the law -- Legal Affairs and
22 Law Enforcement Liaison, right?

Page 120

1    A.   Well, I wouldn't use the word "section."
2  I prefer to use the word "directorates."  So within
3  the Bureau of Consular Affairs, there are multiple
4  directorates.  Passport Services is one
5  directorate.  Fraud Prevention Programs is a
6  separate directorate.
7    Q.   And do they also revoke passports, the
8  Fraud Prevention Program?
9    A.   No.
10   Q.   And I understand that in the Passport --
11 your department, the Passport Legal department,
12 that there's a chief, there's you, there's a chief,
13 and then there are a number of lawyers, I don't
14 know, ten, eight to ten?
15   A.   Five to seven.
16   Q.   Five to seven.  Those lawyers, what sort
17 of training is given to them for purposes of making
18 reviews and determinations that a passport should
19 be revoked, and what is the standard of
20 preponderance of the evidence?
21   A.   Okay.  Well, first, so I think first what
22 I'll tell you is this, amongst -- so there's



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                          121–124

Page 121

1  myself, who's a lawyer, right, I have 20-plus years
2  experience.  There's my division chief, who's a
3  lawyer, 20-plus years experience.
4        Then amongst what I'll call the attorney
5  advisors, right, which are the staff attorneys,
6  amongst those five to seven there is one with more
7  than 20 years' experience, legal experience; two
8  others with four to five years of legal experience
9  here working in the department; another one with
10 seven or eight years' legal experience working at
11 an immigration law firm; and our newbie has only
12 about two or three years' experience working as
13 lawyer.  So they're a pretty experienced group of
14 attorneys.
15       There is no --
16    Q.  If I could pause you.  None of them, it
17 sounds like, had previous jobs as judges?
18    A.  Previous jobs as judges?  Did they sit as
19 judges?  No.
20    Q.  Okay.
21    A.  I have sat as an arbitrator and a
22 mediator in my career.

Page 122

1     Q.  Okay.
2     A.  I can't speak for everybody else.
3        So they -- all of the attorneys go
4  through citizenship and nationality formal
5  training, where they learn citizenship and
6  nationality law.  Then there are weekly staff
7  meetings where they will discuss cases and discuss
8  issues and things like that.
9        Where I'm getting is there's no -- other
10 than the citizenship and nationality, the training
11 in this small office is not formal.  It is group
12 meetings in my office that we had several times, or
13 weekly staff meetings that I conducted the first
14 six months of my tenure and then after that my
15 division chief conducted the staff meetings for the
16 rest of the time.
17       And that's the training that they have.
18 And we talk.  You know, again, we're a small office
19 so, you know, attorneys -- my door is open, my
20 division chief's door is always open, and attorneys
21 come to us and discuss questions, legal issues,
22 things like that.

Page 123

1     Q.  And who provides the citizenship and
2  nationality training that you mentioned earlier?
3     A.  The Foreign Service Institute.
4     Q.  And where is that provided at?
5     A.  Arlington.
6     Q.  And other than these meetings, these
7  staff meetings, and other than the review of a
8  recommendation by one of the attorney advisors that
9  is made by your chief, and other than the review
10 that you make on a case, what is done to ensure
11 that the attorney advisors all are on the same page
12 about what the standard of preponderance of the
13 evidence is?
14    A.  Well, we have meetings.
15    Q.  Other than the meetings.
16    A.  There's staff meetings, there's the
17 meetings in my office where everybody comes in.
18 There is the back and forth that we go through when
19 either myself or my division chief looks at
20 something.
21       But there's also, you know, at CONGIN and
22 citizenship and nationality, that deals with

Page 124

1  adjudication and there is preponderance training
2  there, albeit not with the burden on the department
3  but the burden on the applicant, okay.
4        And I would say that despite the fact
5  that none of the seven attorneys have ever sat as
6  sitting judges, they all have substantial legal
7  experience in weighing evidence through their
8  practice, through their legal practice.
9     Q.  I understand that.  But I just -- I don't
10 want to minimize it, but I just want to make sure
11 that other than the staff meetings, whether
12 everybody's together or in your office, and review
13 by the chief and review by you of the attorney
14 advisors' recommendations, there is no other
15 guidance written that everybody can refer to for
16 application of the preponderance of the evidence
17 standard?
18    A.  Other than what's in the FAM, what's in
19 the statutes, what's in their own legal training
20 and background from taking -- I mean, like, we all
21 got in law school, training on the different
22 standards of proof.  You know, we all had that as



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                            125–128

Page 125

1  well.  And I think that about covers it.
2      Q.   And I'm going to -- I'm going to ask the
3  question and leave a blank.  The question is, where
4  in the FAM does it describe the standard of proof
5  for revoking passports?  And when you go back and
6  review it, if you could fill in the blank.
7      A.   Okay.
8      Q.   And if none, if there's no section, if
9  you could just write in none.  Are you able to --
10  you want me to ask the question again so that --
11      MS. FABIAN:  Javier, I'll just note, too,
12  it is cited in briefing in this case, the FAM.  And
13  I can point you to that at a later point.  In much
14  earlier briefing we did cite to that section of the
15  FAM.
16      MR. MALDONADO:  I know.
17      MS. FABIAN:  It might have been before
18  your time on this case.
19      MR. MALDONADO:  I know.  I don't know
20  what I was looking at last night and today, but I
21  have not --
22      MS. FABIAN:  Okay.  It's in some much

Page 126

1  earlier briefing in this case, we did at one point
2  cite to that section.
3      THE WITNESS:  Well, why don't we do this.
4  We'll leave a blank space, but if you guys come up
5  with some agreement then I don't have to fill in
6  the blank.
7  BY MR. MALDONADO:
8      Q.   Please fill in the blank.
9      A.   Okay.
10      Q.   Did you have a chance to find out about
11  the ProLaw software?
12      A.   I did.
13      Q.   And what can you tell me about what is on
14  the fields that would describe a case?
15      A.   So, well, I think I said this earlier,
16  but just so we get a complete picture, ProLaw is a
17  case management system that is used for all of the
18  office functions.  Okay.
19      It is a name-based system.  Cases are
20  entered into ProLaw.  And so in the case of a
21  revocation case, it would be entered in by the name
22  and it would be identified as revocation case.  It

Page 127

1  does not identify the type of revocation case.  So
2  there's no way to search that it's a
3  non-citizenship or it's a warrant or it's a this or
4  it's a that.  Okay.  It's a revocation case.
5      It also doesn't identify whether -- what
6  the ultimate outcome was, whether the passport was
7  revoked or whether it was not revoked.  It would
8  just identify it completed.
9      It is not a system without its flaws as a
10  case management system.  As any software system has
11  its problems, I've been informed that ProLaw also
12  has its problems.  And so it's not the best, most
13  accurate source for finding cases that we revoked.
14      It was not completely put into place and
15  effectively used as a case management system until
16  late 2011.  And it didn't go backwards.  So, in
17  other words, the cases that are in there would only
18  be cases that came in as revocations beginning in
19  late 2011, okay, and other cases, too.
20      So I think that covers ProLaw for you, if
21  that gives you a good understanding of it.
22      Q.   Can you give me a sense of the size of

Page 128

1  the physical space where the revocation files are
2  kept?
3      A.   Well, again, they're not -- the case file
4  system that we have, the manual case file system
5  for paper copies, is not distinguished by
6  revocations from others.
7      Q.   Right.
8      A.   There are I think it's two or three file
9  cabinets.  Each cabinet is probably four feet wide
10  maybe, three drawers or four drawers high, I would
11  think.  That's my best recollection.
12      Q.   And these three or four cabinets --
13      A.   Two or three.
14      Q.   Two or three cabinets, are they the
15  revocations for all the revocations this office has
16  done since day one or just since you came?
17      A.   Since I came and we were able to get put
18  together.  So I think I said this earlier, when I
19  came on board there was no centralized filing
20  system.  People maintained files, whatever the
21  matter was, revocation or otherwise, at their
22  desks.  And I can't give you an exact date, but

JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                            129–132

Page 129

1  that was one of the things, amongst others, that I
2  changed the process of.
3        So, you know, do we have some that are
4  from earlier?  Yeah, because we probably got them
5  from people that had maybe had a revocation case or
6  two in their files.
7     Q.  So but maybe I'm not understanding.
8  Where are the revocation files that were created
9  before you started with the legal department?
10    A.  Okay.  Well, whatever revocation files
11  that were created before I started with the legal
12  department would have been kept at the people's
13  desks.
14    Q.  Are they still there?
15    A.  No, they would have been moved into the
16  centralized filing system.
17    Q.  The two or three files that you
18  described?
19    A.  Uh-huh.
20    Q.  Okay.  When a case is referred to your
21  office for revocation can you describe to me the
22  various documents that your office would create for

Page 130

1  the file?  Not what was sent to you, but would your
2  secretary -- your assistant, would she create a
3  memo routing it to an attorney or to the chief?
4  Would the chief then create some other memo routing
5  it to an attorney advisor?  I want to -- I want to
6  get a sense of the type of documents that your
7  office creates.
8     A.  Well, I don't think there's a specific
9  document created.  There is a -- there is a -- so
10  we have ProLaw.  That is a case tracking system.
11       There is a manual, and this doesn't apply
12  to revocations, this applies to all assigned work,
13  that attorneys and paralegals keep of their tasks.
14  And that is kept manually and a weekly chart is
15  given, for lack of a better word, to the division
16  chief, of their pending tasks.  That would be
17  something that would track the assignment of a
18  revocation.
19    Q.  That would be --
20    A.  That would be something that would
21  track -- there is not a memo that says, for
22  example, "To attorney from division chief, please

Page 131

1  work on this revocation."
2        The overwhelming majority of them come in
3  electronically as well, so they're forwarded by
4  e-mail.
5     Q.  And then once it's forwarded to the
6  attorney advisor, if you can tell me what would be
7  the documents that the attorney advisor would
8  create for the file that would be passed on to the
9  chief?
10    A.  Could be the letter revoking the
11  passport.  It could be the memo or letter denying
12  the revocation to the requester.  It could be the
13  letter or memo asking for more evidence.  Those
14  documents are created.
15       You know, if the passport is revoked
16  there is a document that is created that is sent to
17  another office so that the information is input
18  into electronic system so that the passport is
19  invalidated.
20    Q.  And then what documentation would the
21  chief prepare before it goes on to you that you
22  would see in the file?

Page 132

1     A.  You mean that she's okay with it?
2     Q.  I don't know what she would prepare.
3     A.  Is that what you're asking me?
4     Q.  Yes, what would she prepare?
5     A.  I mean, the process is she wouldn't
6  prepare anything.  It goes to her first, and then
7  she gives me all the ones she's approved and, you
8  know, puts them in my inbox.
9     Q.  She doesn't create a separate memo?
10    A.  No.
11    Q.  A Post-It?
12    A.  No.
13    Q.  And then is it fair to say that the
14  documents that you would create for the file would
15  be the signing of the final letter?
16    A.  Yeah, I don't -- I would say that I don't
17  create anything.  I get the documents.  I might
18  edit them and send them back, you know.  I might
19  make notes and send them back, just like she might,
20  too.  It's possible.  But, you know, I caution you
21  not to use the word "creation" but I'm not the
22  creator of the paper that comes to me.



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                            133–136

Page 133

1    Q.   And just so that I don't misunderstand
2  your testimony, going back to the hypotheticals
3  where a case was referred to you, we talked about a
4  case where there was a delayed birth certificate.
5        Do you recall that?  And that was the
6  reason --
7    A.   Yeah, I think there were a couple
8  hypotheticals like that, but yeah.
9    Q.   It was referred to you and that was the
10 only evidence on the file.  There was no issue of
11 identity, and that was the only thing that your
12 office was considering for purposes of revocation.
13       Do you recall that?
14   A.   Right.
15       MS. FABIAN:  Object to form.
16 BY MR. MALDONADO:
17   Q.   And if -- I don't want to misstate your
18 testimony, but if I understood it correctly, is if
19 there were no other issues, that if there was no
20 new evidence and it was simply the same evidence
21 that existed at the time of the application, that
22 there would not be grounds for revocation.

Page 134

1        MS. FABIAN:  Object to form.
2        THE WITNESS:  Yeah, I think you also left
3  out one important thing.  It was that there were no
4  errors.
5  BY MR. MALDONADO:
6    Q.   There were no errors?
7    A.   There were no errors.
8    Q.   In the issuance?
9    A.   Right.
10   Q.   And just so I understand, by "errors" you
11 mean that the birth certificate on file belonged to
12 someone else as opposed to the passport holder?
13   A.   It could also mean -- well, you gave the
14 hypothetical of a delayed birth certificate.  And
15 if you look at our regulations, a delayed birth
16 certificate that's more than a year old, in and of
17 itself, is insufficient to issue a passport.  So
18 that would be an error.
19   Q.   Okay.  And let's say the delayed birth
20 certificate was issued within 12 months of the
21 birth.
22   A.   I'm just going to look at the reg,

Page 135

1  because I'm not sure if it's 12 months or six
2  months off the top of my head.
3        Okay, 12 months.
4    Q.   If that was the only issue of why it was
5  referred to you, to your office, that if there were
6  no other issues and there were no errors in the
7  issuance, that that -- the pure existence of a
8  delayed birth certificate would not be grounds for
9  revocation?
10   A.   Delayed less than six months or
11 somewhere, six months, eight months, whatever, less
12 than a year?
13   Q.   Less than a year.
14   A.   That's correct, according to the
15 regulations that would not be an error.
16   Q.   Okay.  And let me change the hypothetical
17 a little bit.  If the birth certificate was by a
18 midwife, it was issued within 12 months, the birth
19 registration was made within 12 months of the
20 birth, and there's no other new evidence, and the
21 outside source referring to you referred it to
22 legal department simply because of this birth

Page 136

1  certificate with a midwife, would that be grounds
2  for revocation?
3        MS. FABIAN:  Object to form.
4        THE WITNESS:  So it's the application
5  contains -- we were clear the identity is valid?
6  BY MR. MALDONADO:
7    Q.   That's right.
8    A.   They provided valid identity.  The
9  passport was issued based on valid identity and a
10 valid birth certificate, executed by a midwife?
11   Q.   Yes.
12   A.   Right.  Did you say a midwife suspected
13 of --
14   Q.   Just a midwife.
15   A.   Just a midwife.
16   Q.   We'll go through the various
17 hypotheticals.
18   A.   Right.  And there's no new evidence, you
19 said no other new evidence, and I --
20   Q.   That's right.
21   A.   But to be clear, there's no new evidence.
22   Q.   That's right.



JONATHAN M. ROLBIN                                          February 20, 2013
CASTRO vs. FREEMAN                                                  137–140

Page 137

1      A.   There's no additional evidence --
2      Q.   That's right.
3      A.   -- other than the two pieces that were
4   used to issue the passport?
5      Q.   That's right.
6      A.   I don't see how we would revoke that.
7      Q.   Let me ask you, are new midwives being
8   added to -- or new names of midwives being added to
9   this list of suspected midwives?
10     A.   I didn't know -- I didn't see that on the
11  list of things I was supposed to be knowledgeable
12  about.
13     Q.   Non-citizen -- you know, I mean, if you
14  don't know, you don't know.
15     A.   I don't know.
16     Q.   Same hypothetical, no issue of identity,
17  the evidence upon which the passport was issued was
18  a birth registration where the birth attendant was
19  on the list of suspected midwives.  And someone at
20  DHS took it upon themselves to refer it for
21  revocation because this was a suspected midwife.
22         Would that be grounds for revocation?

Page 138

1          MS. FABIAN:  I'm going to object.  I
2   think we've been through these hypotheticals
3   before.
4   BY MR. MALDONADO:
5      Q.   That's okay.
6      A.   But I do think we have, too.  And I stand
7   by my prior answer.
8      Q.   Which is?
9      A.   Which is if there's no issue as to -- no
10  error was committed, there's no issue with
11  identity, there's no legal issue, there's no new
12  evidence and the passport was issued based on the
13  valid identification and the validly-issued U.S.
14  birth certificate, and there's nothing else, I
15  don't understand how we would revoke that.
16     Q.   Let's say on no issue of identity, no
17  error or issuance, passport was issued based upon a
18  U.S. birth registration that was contemporaneously
19  issued.  And the source referring the case to the
20  legal department provides the department with a
21  Mexican birth registration issued six months after
22  the U.S. birth registration.

Page 139

1          Would that be grounds to revoke?
2          MS. FABIAN:  Object to form.
3          THE WITNESS:  I think that that -- so
4   there's a new piece of evidence in your
5   hypothetical, correct?
6   BY MR. MALDONADO:
7      Q.   And the new piece -- correct.  The new
8   piece of evidence --
9      A.   Is a foreign birth record.
10     Q.   A later issued foreign birth record.
11     A.   A foreign birth record showing that the
12  person was -- it is the person, it's the parents,
13  it's them?
14     Q.   Yes.
15     A.   Okay.  And nothing else, we've got two
16  birth records and everything else?
17     Q.   Correct.
18     A.   I think that would be looked at.
19  Everything would be assessed under the totality of
20  the circumstances and a decision would be reached.
21         I can't tell you hypothetically without
22  seeing those things as to what the answer would be,

Page 140

1   because each case is looked at individually.  And
2   there are nuances, not just the date, within the
3   records that you raised.
4      Q.   Well, what are the nuances that would
5   cause your department to revoke?
6      A.   Well, I can't tell you all the things.
7   We'd have to look at everything.
8      Q.   Give me a sample, give me a flavor of the
9   nuances that would cause your department to revoke.
10         MS. FABIAN:  Objection to form.
11         THE WITNESS:  I think they would have to
12  look at -- they would look at the entirety of the
13  birth records.
14         There's no other evidence there?
15  BY MR. MALDONADO:
16     Q.   No other evidence.
17     A.   That would be a difficult decision.
18     Q.   Why?
19     A.   Well, the preponderance -- the burden is
20  on the department and there is new evidence there,
21  but the question is whether the new evidence would
22  raise to a level that it's sufficient to -- for the

JONATHAN M. ROLBIN                                        February 20, 2013
CASTRO vs. FREEMAN                                              141–144

Page 141

1  department to satisfactorily revoke the passport.
2         And I -- as your hypothetical is, I can't
3  answer it. I think everything would have to be
4  looked at in detail on that and a decision would
5  have to be made. I can't say that it wouldn't be
6  revoked and I can't say that it would be revoked.
7  It depends on the particular facts of the case.
8         I'd have to see the application, the
9  birth certificates, and make a decision. I'd want
10 to see the dates, I'd want to see where it was
11 issued, I'd want to see when it was issued. I
12 would want to see -- you said when it was issued.
13 I'd also want to see when it was filed. I would
14 want to see who attended the birth.
15     Q.  Why does that matter, who attended?
16     A.  All of that matters.
17     Q.  Why?
18     A.  Because you have to get a picture of the
19 totality of the circumstances.
20     Q.  I understand. But what is unique about
21 who attended the birth?
22     A.  Who file -- well, not who attended, who

Page 142

1  filed the birth certificate. Did the parent file
2  the birth certificate? Did the midwife file the
3  birth certificate? Did the hospital file the birth
4  certificate?
5         How long was the time period from the
6  time of issuance until the time the birth
7  certificate was filed? Was it a lengthy period of
8  time, was it a short period of time? Who --
9      Q.  That's why I said six months.
10     A.  Again, on the Mexican or the foreign
11 birth record, who are the parents there? Who are
12 the witnesses there? What time was the child
13 delivered? How did those things match up? What's
14 the names on the birth certificates, what's the
15 names of the parents, what's the names on the U.S.
16 birth certificate?
17        So there are -- the difficulty with your
18 hypothetical is all of those things, all of those
19 lines on the birth certificates are all looked at
20 and evaluated.
21     Q.  Assuming that the dates of birth, times
22 of birth, names of parents, and that the parents

Page 143

1  registered the birth, and there's no difference in
2  the birth registration other than where the person
3  is alleged to have been born and the fact that the
4  foreign birth certificate was issued six months
5  after the U.S. birth registration.
6         Would that still be grounds to revoke?
7         MS. FABIAN: Objection to form.
8         THE WITNESS: I think those would all be
9  facts that we would consider. I can't answer the
10 hypothetical. I need to look at the whole thing.
11        I need to know what county in both -- I
12 need to know is it somebody in Brownsville and the
13 birth is in Matamoros? Is it somebody in Iowa and
14 the birth is in Mexico City? There's all kinds of
15 things. Is it -- and we just don't have --
16 BY MR. MALDONADO:
17     Q.  And just for the purposes of
18 understanding your testimony, why would it matter
19 that the U.S. registration is in Cameron County as
20 opposed to Iowa City in Iowa, and that the Mexican
21 registration for the Cameron County U.S. city --
22 USC claimant is Matamoros as opposed to an Iowa

Page 144

1  City resident --
2      A.  They're all --
3         MS. FABIAN: Objection.
4  BY MR. MALDONADO:
5      Q.  -- saying that it's in Mexico City?
6         MS. FABIAN: Object to form.
7         THE WITNESS: They're all factors that we
8  would look at. I can't tell you which one -- we
9  have to look at the whole picture.
10 BY MR. MALDONADO:
11     Q.  I just want to understand why they're
12 important. Why is that important that it is a U.S.
13 citizen claimant from Brownsville who has a
14 Matamoros registration, as opposed to an Iowa
15 resident USC claimant who has a registration in
16 Mexico City?
17     A.  There -- I am sure you are aware that
18 there are cases of people who have both U.S. and
19 foreign birth records for which we issue passports.
20 Are you aware of those?
21     Q.  I am aware of those.
22     A.  Okay. And there is some -- there are --

JONATHAN M. ROLBIN                                   February 20, 2013
CASTRO vs. FREEMAN                                         145–148

Page 145

1  well, what I'm not going to go into in detail is
2  our exact thought processes that we go through.
3          What I can tell you is that we would look
4  at the entirety of the documents that were
5  provided, assess the facts and circumstances, and
6  determine whether or not the preponderance standard
7  has been met.
8      Q.   But I --
9      A.   And I can't answer you in this
10  hypothetical without seeing those things.
11     Q.   But I think you do have testimony to give
12  about there's unique about a birth registration
13  from Brownsville where the person also has a
14  Mexican registration from Matamoros six months
15  later, versus an Iowa birth registration where that
16  same person has a registration from Mexico City six
17  months later.
18          What is unique about that evidence?
19  Characterize it for me, that factor.
20          MS. FABIAN:  Object to form.
21          THE WITNESS:  Well, I can't without more.
22  But my mistake in saying what I did was that I

Page 146

1  was -- I was including facts which were not in this
2  hypothetical, okay, and evidence which wasn't in
3  this hypothetical.  And that was my mistake.
4          So to correct my testimony, I guess, what
5  I would say is if there were other facts, that is
6  important.  If there were other facts about where
7  the child went to school, right, or where the
8  parents worked or things like that, that helped
9  portray the picture, that might push things one way
10  or the other.
11  BY MR. MALDONADO:
12     Q.   But is that -- is that in the birth
13  record that your office would get, where the
14  parents worked?
15     A.   No, and what I said is that was probably
16  my mistake.  I was assuming facts in your
17  hypothetical that you didn't give me.
18     Q.   I understand.  But you also characterized
19  it as being that that difference in the applicant
20  or the passport holder would make a difference or
21  have a -- be considered differently in the
22  evaluation.

Page 147

1          Why is that?
2      A.   No, what I'm saying now, if I wasn't
3  clear these last two times, is I think I misspoke.
4  Okay.  I think when I talked about the geographic
5  location, I was more considering other facts that
6  you didn't give me in the hypothetical.  Okay.
7      Q.   I know.  But your testimony was that
8  there would be a difference between someone whose
9  birth registration in the U.S. is in Brownsville
10  and they had a Matamoros -- a Mexican birth
11  registration from Matamoros, versus someone who has
12  a birth registration in Iowa and have a later
13  issued birth registration from Mexico City.
14          Why is -- I understand you want to
15  correct your testimony, but why is that evidence
16  different?  What is the nature of that evidence
17  that makes it different?
18     A.   It's not.
19          MS. FABIAN:  Object to form.
20          THE WITNESS:  I'm telling you, I will
21  tell you one more time, that I misspoke and that I
22  considered things in your hypothetical that you

Page 148

1  didn't present to me when I said that.
2  BY MR. MALDONADO:
3      Q.   That's fine.  But I'm not following up on
4  my question any more.  I'm following up on your
5  testimony of why you think that evidence was
6  different.
7      A.   I've answered the question.
8      Q.   You haven't answered the question.
9          So what is qualitatively different about
10  that evidence in a revocation case where one
11  passport holder has a birth registration in
12  Brownsville and a later issued Mexican birth
13  certificate or birth registration from Matamoros,
14  versus a passport holder with a birth registration
15  from Iowa with a later issued birth registration in
16  Mexico City?
17     A.   There is no difference in that.
18          MS. FABIAN:  Objection.
19  BY MR. MALDONADO:
20     Q.   I'm sorry?
21     A.   There is no difference.  I told you I
22  misspoke.  There is no difference.  In the absence



Case 1:18-cv-00178   Document 19-1   Filed on 02/26/19 in TXSD   Page 39 of 45
Case 1:09-cv-00208   Document 227-3   Filed in TXSD on 03/15/13   Page 39 of 46

JONATHAN M. ROLBIN                                      February 20, 2013
CASTRO vs. FREEMAN                                           149–152

Page 149

1  of additional evidence, there is no difference.
2      What I said, and I'll say it one more
3  time, is in giving you my earlier testimony I was
4  considering evidence that you didn't present me in
5  the hypothetical, which is one of the problems of
6  answering a hypothetical.
7      Q.  Is there a qualitative difference in the
8  evidence of birth where the U.S. registration is --
9  reflects a midwife or a birth attendant who's
10  suspected of fraud versus a U.S. registration of
11  birth where the birth attendant is not on the
12  list --
13      MS. FABIAN:  Object to form.
14  BY MR. MALDONADO:
15      Q.  -- of suspected midwives?
16      MS. FABIAN:  Object to form.
17      THE WITNESS:  Well, for purposes of
18  issuance, I refer you to the Castellano settlement,
19  which says that in and of itself isn't sufficient
20  to deny.  But it justifies a request for additional
21  evidence.
22  BY MR. MALDONADO:

Page 150

1      Q.  That's fine.  We're not here to discuss
2  issuance.
3      But for purposes of revocation, if your
4  office has been referred a case for revocation, or
5  two cases, one reflecting birth registration with a
6  birth attendant from the list of suspected midwives
7  and another case of a birth registration of a
8  midwife who's not on the list suspected of fraud,
9  is that evidence in those two cases qualitatively
10  different?
11      MS. FABIAN:  Objection to form.
12      THE WITNESS:  As I think I said earlier,
13  each case would be looked at individually, looked
14  at the totality of the circumstances.  An
15  assessment would be based -- would be made based on
16  the facts and circumstances of the particular case.
17  BY MR. MALDONADO:
18      Q.  So is it your testimony that the fact
19  that a birth attendant from -- on a U.S.
20  registration is on the list of suspected midwives,
21  is not qualitatively different from a birth
22  registration from let's say Montana where the birth

Page 151

1  attendant is not on the list of suspected midwives?
2      A.  In the absence of any other evidence, any
3  other new evidence, in the absence of anything else
4  that comes in, in a case where there is two
5  applications that were issued, right, and the only
6  evidence for issuance is a driver's license and a
7  birth certificate and both the driver's license and
8  the birth certificate are valid, neither one is
9  delayed more than a year, there's no legal issue,
10  again, I think I said this, but just to be clear,
11  there is no new evidence provided, right, I don't
12  see the difference between those two cases for
13  purposes of revocation.
14      Now, you have to look at the whole
15  picture and any evidence that comes in.  But in
16  your hypothetical, if it's just those two pieces of
17  evidence and that's the whole thing in the case, I
18  don't see a difference.
19      Q.  Other than the regulation of when a birth
20  certificate was issued, is there some other
21  informal guideline that is used in your office for
22  evaluating delayed birth certificates?

Page 152

1      A.  I'm not sure I can answer that.
2      Q.  Sure.
3      A.  I'm not sure what you mean.
4      Q.  For example, does your office, in a
5  revocation case, give it greater weight or
6  consideration to a delayed certificate for purposes
7  of showing citizenship where one registration is a
8  year and a day versus a delayed certificate that is
9  seven years?
10      MS. FABIAN:  Objection to form.
11      THE WITNESS:  I think each of those cases
12  would be looked at individually and an assessment
13  would be made.  If you're asking me would one be
14  revoked and one wouldn't based on that, I can't
15  answer that.
16  BY MR. MALDONADO:
17      Q.  No, I'm just saying whether
18  evidentiary-wise your advisors would say, well,
19  look, this first registration was issued a year and
20  a day after the birth, but this one's after seven.
21  So the one that's a year and a day is somehow more
22  credible than the one that's issued seven years



JONATHAN M. ROLBIN                                        February 20, 2013
CASTRO vs. FREEMAN                                              153–156

Page 153
1  later.
2      A.   I think those are facts to be considered.
3      Q.   And would those facts, the year and a day
4  birth certificate versus a seven-year delayed birth
5  certificate, would they tend to show -- more likely
6  to show U.S. citizenship or not?
7          MS. FABIAN:  Objection to form.
8          THE WITNESS:  Well, I stand by our
9  regulations, which, in the absence of some other
10  piece of evidence, they are not in and of
11  themselves sufficient to prove U.S. citizenship.
12  BY MR. MALDONADO:
13      Q.   So they are the same?
14      A.   Sure.  For purposes of our regulations,
15  absolutely, you need to submit something
16  additional.
17      Q.   In the case of a passport holder whose
18  case has been referred to your office for
19  revocation, where the birth registration, a
20  foreign-born registration exists, what
21  consideration is given by your office to the fact
22  that the birth registration, foreign-born

Page 154
1  registration, has not been amended or corrected?
2          MS. FABIAN:  Objection to form.
3          THE WITNESS:  That is a fact to be
4  considered, along with all the other facts in the
5  case.
6  BY MR. MALDONADO:
7      Q.   And how is that fact considered relative
8  to another case where the passport holder whose
9  case has been referred to your office for
10  revocation has amended a foreign-born registration?
11      A.   It may be getting late in the day, I may
12  be tired, but I can't -- I'm not quite sure I'm
13  following the distinction here.
14      Q.   Sure.  The distinction is one where the
15  passport holder corrected or amended their
16  foreign-born registration to reflect that they were
17  not born in a foreign country but born in the U.S.,
18  and another passport holder who has a foreign-born
19  registration and they didn't amended it or
20  corrected it at all.
21          MS. FABIAN:  Objection.
22  BY MR. MALDONADO:

Page 155
1      Q.   And the fact that one amended it and one
2  did not, what is the consideration given to each
3  fact?
4          MS. FABIAN:  Objection to form.
5          THE WITNESS:  Each case would be looked
6  at individually based on the totality of the
7  circumstances and the facts, including the
8  application that they provided, the evidence they
9  provided at the time of the application, and any
10  new evidence.
11          I can't answer that question the way
12  you're asking me.  I don't know how you want me to
13  answer it.  It's not how you want me to answer.
14          I don't know how I can answer it when
15  you're just asking me to focus on one particular
16  fact and what I'm telling you, and I think I've
17  said this a number of times, is there is not one
18  particular fact that distinguishes one case from
19  another case.  There are facts within a case and we
20  look at the facts of each case individually and get
21  a picture of that case.
22  BY MR. MALDONADO:

Page 156
1      Q.   But there are, as you know, good facts
2  and bad facts in a case.  And good facts tend to
3  prove something, bad facts tend to disprove
4  something.  Or if what you're -- if the burden is
5  to prove, good facts would tend to disprove
6  something, bad facts would tend to prove it.
7          So you understand, given your 20 years of
8  lawyering, the difference between a good fact and a
9  bad fact, don't you?
10          MS. FABIAN:  Objection, argumentative.
11          THE WITNESS:  Sure.
12  BY MR. MALDONADO:
13      Q.   Sure.  And so to the extent that your
14  office is considering all of these facts in its
15  determination whether to revoke or not, some facts
16  may tend more to show or may tend more to prove
17  that -- to establish the preponderance of the
18  evidence has been met, the standard has been met to
19  revoke.  And some facts would tend to show that the
20  preponderance of the evidence standard has not been
21  met.
22          Would you agree with that?



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                          157–160

Page 157

1    A.  I would agree with what you're saying, is
2  that there are good facts and bad facts.  What I'm
3  having difficulty with is you're asking me in a
4  vacuum to look at a particular case that doesn't
5  exist and try to assess what's a good fact versus a
6  bad fact.
7        And what I'm trying to tell you is that
8  any factfinder, I would assume, and certainly
9  factfinders in my office, will look at the totality
10  of the circumstances and assess the facts based on
11  the totality of those circumstances.  And that's
12  what we do.
13    Q.  I understand that.  I understand that in
14  the totality it will be reviewed.  But the facts
15  that are being considered, some of them will tend
16  to prove that the standard or preponderance of the
17  evidence has been met and some facts will tend to
18  disprove that the preponderance of the evidence
19  will be -- has not been met.
20        And so I understand that your advisor
21  will be juggling all of these facts.  Some of them
22  are good, some of them are bad, but they do have a

Page 158

1  qualitative difference.  Not every fact is at the
2  same weight.
3        Do you appreciate that?
4    A.  I do appreciate that.
5        MS. FABIAN:  Objection to form.
6        THE WITNESS:  But, you know, part of it
7  is -- you know, what I will say is this.  There can
8  be a bad fact, but that bad fact can be refuted by
9  additional facts that come in as well.
10  BY MR. MALDONADO:
11    Q.  That's right, yes.  I appreciate -- I
12  accept that.  I accept that.  I don't accept your
13  testimony or it's not believable to say that every
14  fact is the same, and so you can't say whether that
15  one fact is bad or one fact is good.
16    A.  Wait a minute.
17        MS. FABIAN:  I'm going to object to the
18  commentary here on the testimony.
19        MR. MALDONADO:  You just make the
20  objection, Sarah.
21        THE WITNESS:  I'm not --
22        MS. FABIAN:  There's no question.  I'm

Page 159

1  going to ask you to ask you a question.
2        MR. MALDONADO:  Just make the objection.
3  Objections are privilege, form, irrelevant, and
4  that's all that the objecting attorney can say.
5  BY MR. MALDONADO:
6    Q.  So going back, Jonathan, you know, there
7  are qualitative differences between facts in a
8  case.
9        Do you appreciate that?
10    A.  Yes.
11    Q.  And so are you telling me that in the
12  abstract when considering a revocation case, you
13  cannot tell me that the fact that a later issued
14  foreign birth certificate is present in a passport
15  holder's revocation file is the same, you know, has
16  no qualitative difference as compared to the
17  presence of a U.S. birth registration?
18        MS. FABIAN:  Objection to form.
19        THE WITNESS:  I don't think that's what I
20  said.  You know, if there's new evidence, and that
21  new evidence refutes the claim of birth in the
22  United States, that is a bad fact for the

Page 160

1  applicant.
2  BY MR. MALDONADO:
3    Q.  That is bad.  I mean, that's all I'm
4  asking for you to tell me.  I mean if --
5    A.  That is bad fact for the applicant.  Does
6  that mean the passport will be revoked based on
7  those facts?
8    Q.  That's a different question.
9    A.  That's hard to answer.
10    Q.  That's a very different question.
11    A.  That's what you seem to be asking me for
12  the last -- throughout most of this deposition,
13  this hypothetical, would we revoke that passport,
14  and I can't answer that.  There are bad facts and
15  there are good facts.
16    Q.  Okay.  And just -- and without going to
17  the ultimate question of whether a passport would
18  be revoked, would you agree that the -- that in a
19  pass -- a revocation case that is referred to you
20  that displays a U.S. birth registration, that
21  postdates a foreign-born registration, that the,
22  for example, that the fact that the posted -- the



Case 1:18-cv-00178  Document 19-1  Filed on 02/26/19 in TXSD  Page 42 of 45
Case 1:09-cv-00208  Document 227-3  Filed in TXSD on 03/15/13  Page 42 of 46

JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                         161–164

Page 161

1  U.S. birth registration postdates the foreign birth
2  registration is a bad fact --
3        MS. FABIAN:  Objection to form.
4  BY MR. MALDONADO:
5     Q.  -- for the passport holder?
6        MS. FABIAN:  Objection to form.
7        THE WITNESS:  Well, I'm not sure I
8  followed that question.
9  BY MR. MALDONADO:
10    Q.  Sure.  Revocation case sent to your
11 office that has a birth registration in the file
12 and then there's also an earlier issued
13 foreign-born registration for the passport holder.
14    A.  There's a revocation -- so to be clear,
15 there is a U.S. birth registration in the file,
16 timely filed.  Is that your hypothetical?
17    Q.  Well, there's a U.S. birth registration,
18 let's say with a date of June, 1985, and then
19 there's a foreign-born registration with a date of
20 January, '85.
21       MS. FABIAN:  Objection.  Is there a
22 question?

Page 162

1  BY MR. MALDONADO:
2     Q.  Is that -- do you appreciate the facts
3  now?  The U.S. registration is after the Mexican or
4  the foreign-born registration.
5     A.  Those are the registration dates or those
6  are the birth dates?
7     Q.  Birth dates.
8     A.  Okay.  When were the documents
9  registered?  Because that's another fact we
10 consider.
11    Q.  They were considered -- they were filed
12 contemporaneously.
13    A.  So January, '85, birth overseas, filed
14 January, '85?
15    Q.  Correct.
16    A.  I don't know where you were --
17    Q.  June, '85.
18    A.  June, '85, domestic birth?
19    Q.  Filed June.
20    A.  Filed June, '85.  Same person, no other
21 issues, no errors, no --
22    Q.  Right.

Page 163

1     A.  -- legal problems, no anything?
2     Q.  Correct.
3     A.  And the question is?
4     Q.  The question is that your office would
5  view the existence of an earlier contemporaneously
6  filed foreign-born registration as a bad fact for
7  the passport holder?
8     A.  That is a derogatory fact for somebody
9  claiming birth in the United States.
10    Q.  Okay.  And is that the term that is used
11 in the -- in your review process, that it's not
12 good or bad fact but it's derogatory?
13    A.  We don't use the words "good" and "bad."
14    Q.  But is that -- do you use --
15    A.  That would be -- I would call that
16 derogatory evidence.
17    Q.  And let me ask you, if that's how it came
18 to your office, would your office revoke based
19 on --
20    A.  That's the question I told you before I
21 have difficulty answering, because I've got to look
22 at the whole kit and caboodle, the whole ball of

Page 164

1  wax, the totality of the circumstances, and
2  everything on those documents and everything that
3  was submitted at the application and all the new
4  evidence that came in.
5        I apologize for the misunderstanding.
6  There are certainly derogatory facts, but the
7  difficulty is answering your hypothetical about
8  would we or would we not revoke.  That I'm unable
9  to do.
10    Q.  What weight or consideration is given by
11 your office to a foreign decree amending the
12 foreign registration, that in a case that was
13 forwarded to your office for revocation, where the
14 passport holder held a foreign-issued birth
15 registration?
16       MS. FABIAN:  Objection to form.
17       THE WITNESS:  Can you read back the
18 question?
19       (The reporter read back as requested.)
20       THE WITNESS:  That is a fact we would
21 consider in assessing all of the facts.
22 BY MR. MALDONADO:



JONATHAN M. ROLBIN                                    February 20, 2013
CASTRO vs. FREEMAN                                              165–168

Page 165

1      Q.   No, but I'm more curious, I'm more
2   interested in finding out whether the fact that it
3   was adjudicated by a foreign judicial proceeding is
4   conclusive evidence that the foreign-born
5   registration was wrongly issued.
6      A.   Conclusive evidence, no.
7          MS. FABIAN:  Objection to form.
8          THE WITNESS:  I would not reach that
9   conclusion.
10  BY MR. MALDONADO:
11     Q.   For example, or if the -- if that issue
12  had been litigated in a State Court where -- in
13  Texas you can fight sometimes the vital statistics
14  tries to cancel someone's birth registrations when
15  it's a delayed birth registration, and you can
16  fight it in State Court.
17         If the State Court were to rule in favor
18  of the registrant that their registration is proper
19  and legal, would that be conclusive evidence for
20  your office that the birth registration is
21  legitimate and dispositive of citizenship?
22         MS. FABIAN:  Objection to form.

Page 166

1          THE WITNESS:  Dispositive?  No.
2   BY MR. MALDONADO:
3      Q.   And why wouldn't it be dispositive?
4      A.   I think that calls for a legal
5   conclusion.  The determination of the State Court
6   is not binding on the federal government.
7      Q.   Right.  It's the registration is still
8   prima facie evidence of --
9      A.   Right, but you asked me whether or not
10  it's dispositive.
11     Q.   But the decree itself --
12     A.   You asked me whether or not it's
13  conclusive and it's not.
14     Q.   But the additional question, would the --
15  would your department be bound as well by the
16  decree from the State Court?
17     A.   Bound in what sense?
18     Q.   Affirming that the registration of birth
19  is proper and correct.
20     A.   Bound in what sense?
21     Q.   In that it properly reflects birth in the
22  United States.

Page 167

1          MS. FABIAN:  Objection to form.
2          THE WITNESS:  No, the federal government
3   is not bound by that.
4   BY MR. MALDONADO:
5      Q.   In reviewing revocation cases where
6   there's evidence of a foreign-born registration,
7   does your office have access or can it access such
8   registrations in foreign countries, let's say
9   Mexico?
10         MS. FABIAN:  Objection to form.
11         THE WITNESS:  Access, I don't know what
12  you mean by "access."
13  BY MR. MALDONADO:
14     Q.   The databases in Mexico for birth
15  registration in the various states, having
16  permission from the -- from the federal government
17  in Mexico or the various states to go to their
18  registry and review records.
19         MS. FABIAN:  Objection to form.
20         THE WITNESS:  So what's the question?
21  Does the state --
22  BY MR. MALDONADO:

Page 168

1      Q.   Does your -- in considering, in reviewing
2   a revocation case where there is this existence of
3   a foreign-born registration, does your office have
4   access to the vital statistics records in the
5   foreign country where the birth registration was
6   issued?
7      A.   I think the only way I can answer that is
8   to say that -- well, I'm not sure if you're talking
9   about electronic access.
10     Q.   Any access.
11     A.   Some of those accesses are public, so the
12  answer is yes.
13         MR. MALDONADO:  Okay.  Five, ten minutes
14  to review my notes, and I think I'm going to be all
15  done.
16         MS. FABIAN:  Okay.  Off the record.
17         (Recess taken at 1:10 p.m.)
18         (Deposition resumed at 1:16 p.m.)
19  BY MR. MALDONADO:
20     Q.   You can just say I want to correct
21  something.
22     A.   Okay.  I just want to correct something

JONATHAN M. ROLBIN                                February 20, 2013
CASTRO vs. FREEMAN                                         169–172

Page 169

1 on the record. My earlier testimony about file
2 cabinets was egregiously low. So I went back and
3 counted. And I got the size wrong, too.
4        There are approximately ten, five-drawer
5 cabinets, five-drawer in height. There are
6 approximately four three-drawer cabinets, and there
7 are 19, approximately 19 two-drawer cabinets of
8 files. Those contained everything from soup to
9 nuts that the legal department works on, including
10 revocations, but all other things as well.
11    Q. And if I understand correctly, they're
12 all organized alphabetically by last name?
13    A. Correct.
14    Q. I'm going to -- if I can, I'd like to go
15 through a series of facts. And if you could, now
16 that the term may be that you like better is
17 "derogatory," if you could in a passport revocation
18 case, could you describe it as being derogatory or
19 not in terms of a passport holder's claim to
20 citizenship?
21        Do you understand my question?
22        MS. FABIAN: Object to form.

Page 170

1        THE WITNESS: I understand the question.
2 I'm not sure I can answer it, but --
3 BY MR. MALDONADO:
4    Q. Let's give it a try.
5        We talked earlier about the existence of
6 an earlier issued foreign-born certificate
7 contemporaneous, same -- of the birth in the file
8 at the same time where there is a later-issued U.S.
9 birth certificate contemporaneous, and you said
10 that would be a derogatory fact, correct?
11    A. Okay. Well, I think I said if that's new
12 evidence that would be derogatory. We're talking
13 about -- I'd ask that you identify for me what the
14 new evidence is. Because we're talking about
15 revocations. I think as I've said before, in the
16 absence of error, legal issue, or something else,
17 we look at new evidence that was not previously
18 before the department.
19    Q. Okay. Let me ask you something. Are
20 there -- do you know what the regulation is of
21 revocations that you did, that your office did,
22 that was not 51.62(b) or 51.62(a), but based on

Page 171

1 error? How many -- what is the regulation that you
2 refer to there?
3    A. Well, first of all, there's a statute.
4 There's 8 USC 1504.
5    Q. Yes.
6    A. Okay. If I understand your question,
7 you're asking me what's the basis for a revocation
8 on error?
9    Q. Right. Because if I understand
10 correct -- maybe I'm wrong.
11        If you're going to -- if a revocation --
12 if a passport is cancelled based on error in the
13 initial application, that would not be a revocation
14 under 51.62(b), correct?
15    A. That would be correct.
16    Q. And so the regulatory basis for that
17 would be what?
18    A. For an erroneous --
19    Q. Yes.
20    A. Passport issued erroneously, would be
21 51.62(a)(2).
22        Did I say 51.62(a)(2)?

Page 172

1        THE REPORTER: Yes.
2 BY MR. MALDONADO:
3    Q. So does your office get referrals from
4 outside sources for revocation simply on the basis
5 that the initial evidence of citizenship included a
6 U.S. birth registration of a birth attendant who's
7 on the list of suspected midwives?
8        MS. FABIAN: Objection to form.
9        THE WITNESS: I have no specific
10 recollection of receiving a revocation request like
11 that, but, you know, I think I told you I've been
12 in this position for three years. You know, just
13 on that basis and that was the basis that the
14 passport was issued as well, I can't recall one of
15 those off the top of my head.
16 BY MR. MALDONADO:
17    Q. Because you don't need new evidence to
18 revoke a passport based on issued in error, right?
19    A. Well, you need evidence that there was an
20 error committed.
21    Q. And is that an error that your office
22 considers, that the birth registration included a



JONATHAN M. ROLBIN
CASTRO vs. FREEMAN

February 20, 2013
173–176

Page 173

1  birth attendant that was on the list of suspected
2  midwives?
3      A.  You mean the passport was issued based on
4  a --
5      Q.  Birth record.
6      A.  -- birth record issued by a midwife, and
7  that fact alone --
8      Q.  Yes.
9      A.  -- was an erroneous issuance?
10     Q.  Yes.
11     A.  No.
12     Q.  Do you still need new -- is your office
13  required -- I'm just trying to figure out --
14     A.  The question is whether that would be a
15  considered an erroneous issuance, and it would not.
16     Q.  But as I understand correctly, you don't
17  need new evidence for those sorts of revocations,
18  51.62(a)(2)?
19     A.  True.
20     Q.  Right?
21     A.  But an error can be a miscalculation
22  under a statute.

Page 174

1      Q.  You mean like times, the parents' years
2  or --
3      A.  Could be that.  Could be -- there are
4  statutes that require that the child be a certain
5  age and the adjudicator didn't add correctly.
6      Q.  But is it your testimony that for
7  51.62(b), there must always be new evidence to
8  trigger revocation?
9      A.  Well, there would need to be.  So
10  51.62(b) is the revocation when the department's
11  determined that they're not a national -- okay.
12  Let me put it this way.  Let's use a diplomat,
13  okay.
14          In the case of a diplomat, I don't know
15  what you're saying is new evidence.  There -- it's
16  not all of a sudden that the father became a
17  diplomat.  It's that --
18     Q.  It was discovered.
19     A.  It was discovered, right.
20     Q.  Right.  That's what I mean, some new fact
21  comes to light.
22     A.  Absolutely.

Page 175

1      Q.  And I just want to be sure that I
2  understand that --
3      A.  Or a certificate of naturalization is
4  cancelled.  That's a new fact.  Or a certificate of
5  citizenship is cancelled.
6      Q.  I just -- I just don't want to have the
7  impression that just cases are flooding your office
8  just because someone suspects.  There's no new fact
9  and they're just sending them to your office to
10  review.
11          MS. FABIAN:  Objection to form.
12          THE WITNESS:  Well, I think we discussed
13  this earlier, but the -- you know, our policy is
14  that the burden is on the department to revoke.  So
15  the revocation can't be just on what was presented
16  at the time of the application.  Otherwise, you
17  wouldn't meet the burden of proof.  You need
18  something to shift the burden to the department and
19  the department meet that preponderance standard.
20          MR. MALDONADO:  I got distracted there.
21  I have no further questions.
22          MS. FABIAN:  I have no questions.

Page 176

1      MR. MALDONADO:  Thank you, Jonathan.
2      THE WITNESS:  Thanks.
3                  - - -
4  (Deposition concluded at 1:25 p.m.)
5                  - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

